**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS,  SHERMAN DIVISION**

———————————————————————

| | |
|---|---|
| **SANDRA KELLY, Individually and as Next Friend of R.K., a Minor, and DANIEL KELLY,** | **Civil Action No. _____** |
| **Plaintiffs,** | |
| **v.** | |
| **WINNSBORO INDEPENDENT SCHOOL DISTRICT and BOARD OF TRUSTEES OF THE WINNSBORO INDEPENDENT SCHOOL DISTRICT, DUNCAN McADOO, BRANDON GREEN, STACY "CHIP" BROWN, JAY MURDOCK, KRISTIE AMASON, BILLY SAUCIER, BRIAN BUSBY,** | **COMPLAINT AND JURY DEMAND** |
| **Defendants.** | |

———————————————————————

Plaintiffs Sandra Kelly, Individually and as Next Friend of R.K., a Minor, and Daniel Kelly (collectively "Plaintiffs"), by their attorneys Nesenoff & Miltenberg, LLP, and Hossley & Embry, LLP as and for their Complaint against Defendants Winnsboro Independent School District, and the Board of Trustees of the Winnsboro Independent School District, allege as follows:

## THE NATURE OF THE ACTION

1.      This case arises out of the actions and omissions of Defendants Winnsboro Independent School District ("Winnsboro" or "WISD" or the "School") , the Board of Trustees of Winnsboro Independent School District ("Board" or "School Board")(collectively "Defendants"), in connection with Defendants' failure to comply with legal mandates under federal law in response to multiple complaints made by Plaintiffs of serious verbal and physical sexual and disability-based bullying, harassment, stalking, discrimination, and retaliation (referred

1

collectively herein as "Complaints"), which actions were made towards Plaintiff R. K. ("R. K." or "Student A")[1] by other students at WISD.

2.     Plaintiff R. K., a student with a disability, endured at least six (6) incidents of serious verbal and physical sex-based and disability-based harassment and other actions by two WISD students (collectively, the "Incidents").

3.     Plaintiffs made complaints regarding those Incidents to the Defendants on at least twelve (12) occasions, including complaints made by phone, in person, by email, and through public comment at School Board meetings (collectively, the "Complaints").

4.     Defendants failed to investigate, adjudicate, and resolve the Complaints. The Defendants instead engaged in an intentional, organized, ongoing campaign to stalk and retaliate against all Plaintiffs, causing each of them fear, anxiety and severe emotional distress, among other damages.

5.     Defendants, in retaliation for the Complaints, made up false stories about each of the Plaintiffs, and communicated those falsities verbally and in writing on numerous occasions, including in the permanent educational record of R. K., and in the permanent employment record of S. Kelly, who was an employee of WISD at the time.

6.     Defendants, in retaliation for the Complaints, wrongfully suspended S. Kelly from her employment with WISD, banned her from WISD campus, and refused to renew her employment contract, among other unlawful actions. Defendants also engaged in an investigation of S. Kelly and filed false allegations against her before the licensing board.

---

[1] Plaintiff R. K. is a minor, and Plaintiffs Sandra and Daniel Kelly are in this action both as his parents, and with independent legal claims against Defendants.

7.      Defendants, in retaliation for the Complaints, wrongfully issued a trespass warning to D. Kelly, filed false complaints with his employer, and banned him from WISD campus, among other unlawful actions.

8.      These actions and omissions by Defendants, as well as those additional actions and omissions detailed below, were in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 *et. seq.*; in violation of Title II of the Americans with Disabilities Act of 1990, U.S.C. §§ 12131 *et seq.* and its implementing regulation at 28 C.F.R. Part 35; in violation of Section 504 of the Rehabilitation Act of 1973 (Section 504), as amended, 29 U.S.C. § 794, and its implementing regulation at 34 C.F.R. Part 104; and in violation of the Defendants' own Policies and Procedures. [2]

9.      By violating its own policies and procedures, Defendants deprived Plaintiff R. K. of fair and impartial Title IX and ADA investigations of the Complaints, and forced him to continue to endure further harassment, stalking and retaliation for a significant period of time. Plaintiff R. K. withdrew from WISD and enrolled in another school district, as a direct and proximate result of the Defendants' actions and inactions in response to the Complaints.

10.     Defendants, with actual and constructive knowledge of the Complaints, acted and failed to act with deliberate indifference to the Complaints, and created a hostile school environment for R. K., his sister, and his parents S. and D. Kelly.

11.     Accordingly, Plaintiffs bring this action to obtain damages and declaratory judgments.

---

[2] Policies and Procedures of the Defendants are defined below, and include the Student Handbook, and other policies and procedures of WISD.

## **THE PARTIES**

12.     Plaintiff R. K. is a natural person and a resident of Texas. During the events relevant to this action, starting in the 2021-2022 school year, R. K. was enrolled as a seventh-grade student at Winnsboro. R. K. has since withdrawn from Winnsboro and transferred to another district as a direct result of Defendants' actions and omissions detailed herein.

13.     Non-party Student B was a male student at WISD during the events detailed herein, is a non-party to this action, and is referred to herein with a pseudonym because he is a minor, and his name is not relevant to the claims against the Defendants in this action.

14.     Non-party Student C is R. K.'s sister, and during the events relevant herein, starting in the 2021-2022 school year, was a sixth-grade student. Student C is an athlete at WISD and is currently a WISD student. Plaintiffs refer to Student C with a pseudonym because she is a minor, a non-party to this action, and the use of her name is not relevant to the action.

15.     Non-party Student D was a male student at WISD during the events detailed herein, is a non-party to this action, and is referred to herein with a pseudonym because he is a minor, and his name is not relevant to the claims against the Defendants in this action.

16.     Plaintiff S. Kelly is a natural person and a resident of Texas. During the events described herein, S. Kelly was an employee, and subsequently a former employee, of Winnsboro. S. Kelly is the mother of Students A and C, who were both students at Winnsboro during those events.

17.     Plaintiff D. Kelly is a natural person and a resident of Texas. During the events described herein, D. Kelly was the father of Students A and C, who were both students at Winnsboro during those events. D. Kelly is employed by the Texas Department of Public Safety ("DPS") Criminal Investigations Division ("CID") as a Special Agent.

18.     Defendant Winnsboro Independent School District is a partially federally funded, public, non-profit educational corporation with a principal place of business in Winnsboro, Texas.

19.     Defendant Board of Trustees of Winnsboro Independent School District is the School Board of a partially federally funded, non-profit educational corporation with a principal place of business in Winnsboro, Texas.

20.     Defendant Duncan McAdoo ("McAdoo") is a natural person and a resident of Texas. During the events described herein, Duncan McAdoo was a member of the Board of Trustees of the Winnsboro Independent School District.

21.     Defendant Brandon Green ("Green") is a natural person and a resident of Texas. During the events described herein, Brandon Green was a member of the Board of Trustees of the Winnsboro Independent School District.

22.     Defendant Stacy Brown ("Brown") is a natural person and a resident of Texas. During the events described herein, Stacy Brown was a member of the Board of Trustees of the Winnsboro Independent School District.

23.     Defendant Jay Murdock ("Murdock") is a natural person and a resident of Texas. During the events described herein, Jay Murdock was a member of the Board of Trustees of the Winnsboro Independent School District.

24.     Defendant Kristie Amason ("Amason") is a natural person and a resident of Texas. During the events described herein, Kristie Amason was a member of the Board of Trustees of the Winnsboro Independent School District.

25.     Defendant Billy Saucier ("Saucier") is a natural person and a resident of Texas. During the events described herein, Billy Saucier was a member of the Board of Trustees of the Winnsboro Independent School District.

26.     Defendant Brian Busby ("Busby") is a natural person and a resident of Texas. During the events described herein, Brian Busby was a member of the Board of Trustees of the Winnsboro Independent School District.

## JURISDICTION AND VENUE

27.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367, because respectively: (i) the federal law claims arise under the constitution and statutes of the United States; (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

28.     This Court has personal jurisdiction over Defendants on the grounds that they conduct business within the State of Texas.

29.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and the Defendants' principal place of business is in this district. Moreover, venue in this Division of the Eastern District is appropriate. There are fact witnesses and members of the Board who reside within this Division and there is no other Division of the Eastern District of Texas which is clearly more convenient.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I.      **The Unlawful Behaviors Towards Plaintiff R. K. by Students at WISD**

**Incident 1**

30.     On or about August 17, 2021, Plaintiff R. K. was subjected to bullying and sexual harassment by another student, Student B, on the WISD campus when Student B used sexually explicit language targeted at Plaintiff R. K.. ("Incident 1").

**Incident 2**

31.     In or about November 2021, Plaintiff R. K. was sexually harassed on the school bus by Student B. ("Incident 2").

**Incident 3**

32.     In or about November 2021, sexually explicit images involving child nudity were airdropped to multiple students, including at least one image of Student B. One of those images was shown to R. K. on another student's phone. ("Incident 3").

**Incident 4**

33.     On or about December 7, 2021, Student B approached R. K., who was in line in athletics, and said (in reference R. K. and the student standing in line in front of him): "you are so gay you look like you are trying to fuck him". ("Incident 4").

**Incident 5**

34.     In or about April 2022, R. K. was bullied again by Student B, after which he was physically assaulted in the boy's locker room for being "a snitch" by Student B's best friend Student D. ("Incident 5").

35.     Thereafter, R. K. was threatened by Student D with additional future physical harm if R. K. "snitched" on Student B again.

**Incident 6**

36.     On March 30, 2023, R. K. was again physically assaulted by Student B. ("Incident 6").

**Incident 7 (against another student)**

37.     On April 28, 2022, the same week of D. Kelly's public comments at the Board Meeting seeking action to be taken regarding the harassment of his son R. K. by Students

B and D, and only six (6) days after R. K. was physically assaulted by Student D, another student at WISD was allegedly cornered in a bathroom stall by Students B and D, which caused the student to cry. ("Incident 7").

## II.   Plaintiffs Filed Numerous Complaints, Yet Defendants Failed and Refused to Investigate

**Complaint 1**

38.    On August 17, 2021, Plaintiff S. Kelly informed Junior High Principal Jeff Akin ("Principal Akin") and Junior High School Counselor Kristi Hollingsworth ("Counselor Hollingsworth") by telephone about Incident 1 that occurred on or about August 17, 2021.

39.    S. Kelly detailed the bullying and sexual harassment that her son sustained on WISD campus by Student B.

40.    S. Kelly expressed to Principal Akin and Counselor Hollingsworth her particular concerns that the Incident was seriously impacting her son's emotional well-being. Her son, R. K., had a disability under Section 504 of the Rehabilitation Act of 1973, including ADHD, an anxiety disorder, generalized anxiety disorder, and separation anxiety disorder. He was not officially registered with WISD as having a disability until December of 2021. It appeared from the language and behavior of Student B, that he was targeting her son because other students perceived him as shy, weak, and unable to defend himself against such attacks. On or about August 17, 2021, in response to a request from Principal Akin, S. Kelly emailed Akin a list of the explicit language used against Student A by Student B.

41.    This was not the first complaint that Defendants had received about unlawful behavior by Student B towards other students. During the previous spring semester of 2021, WISD had received a complaint of sexual harassment by the same perpetrator, Student B, against a different student, to whom Student B harassingly accused of "liking big black cocks in the ass".

The parents of Student B's victim filed a complaint with Defendants, who allegedly confirmed that the sexual harassment was taking place but took no action regarding the Complaint.

42.    Upon information and belief, the Defendants failed to investigate this complaint of bullying and sexual harassment towards R. K..

**Complaint 2**

43.    In or about November 2021, Plaintiff S. Kelly reported Incident 2 to WISD staff, informing Defendants that Plaintiff R. K. was sexually harassed on the school bus.

44.    Defendants failed to investigate this complaint about sexual harassment towards R. K.

**Complaint 3**

45.    Plaintiff D. Kelly communicated with Child Protective Services ("CPS") about the sexually explicit child pornography photos that were distributed to students at WISD by Student B, Incident 3, which advised him that the images were concerning, and that WISD should be notified.

46.    The Kellys also reported Incident 3 to WISD staff, and expressly pleaded with them to minimize R. K.'s exposure to the harmful child pornographic material that had been circulated by Student B, and to stop Student B's unlawful behavior towards Student A.

47.    The Kellys informed WISD staff of recent advice they had received from R. K.'s physician to minimize his stress and stop his exposure to the harmful child pornographic material that was circulated to WISD students.

48.    Coach Huffman, Coach McAfee, R. K.'s basketball coaches, and Counselor Hollingsworth all confirmed to the Kellys that sexually explicit child nudity images of Student B were disseminated to WISD students.

49.     Counselor Hollingsworth also confirmed by a text message to S. Kelly that at least one of the sexually explicit images involving child nudity that R. K. saw was of Student B. Hollingsworth added: "He is a shit!! His time will come! I promise you that! I hate that [Student A] is struggling! Breaks my heart!."

50.     Hollingworth later testified before the School Board that she did not know these details about Student B's involvement in Incident 3, until she was shown her own text messages which established otherwise.

51.     Coaches Huffman and McAfee acknowledged to the Kellys that Student B's behavior was ongoing and problematic. The Coaches expressed their hesitation to investigate the Complaints, claiming it would be a challenge to address this issue with Student B's parents. Huffman and McAfee recommended the Kellys to meet with Athletic Director Joshua Finney. However, the next school day, before the Kellys had time to schedule that meeting, they were informed by WISD staff that the situation had been "taken care of".

52.     Defendants failed to investigate and adjudicate the Complaints regarding Incident 3 or take any action to provide R. K. with adequate support. By their own admission, Defendants appear to have engaged in an informal resolution of Student B's behavior, without R. K.'s knowledge or consent.

53.     As a result of Defendants' failure to act, R. K. removed himself from the WISD basketball team, where some of the bullying and sexual harassment was taking place, to attempt to limit the stress and fear that he was feeling because of the Incidents.

**<u>Complaint 4</u>**

54.     On or about December 5, 2021, S. Kelly emailed WISD to report the Incidents, informing them that her son, R. K., was the victim of "verbal harassment" and that he "has been exposed to horrific sexual language, racial slurs and sexual images." (The December 5, 2021, email from S. Kelly to WISD is referred to herein as the Bully Report).

55.     The Bully Report also detailed the Kellys' professional training and experience, the relevance of their background in assessing the sexual harassment of their son, and why they believed there was cause for concern.

56.     The Bully Report identified historical and familial abuse involving Student B's father, and paralleled the behaviors being exhibited by Student B towards Student A at WISD, which may have played a role in the retaliatory behavior.

57.     Finally, the Bully Report included a summary of the detrimental effects the harassment was having on Student A's well-being along with a plea for help from WISD in resolving the situation.

58.     Defendants failed to investigate this complaint of bullying and sexual harassment towards R.K..

**Complaint 5**

59.     R.K.'s parents contacted Counselor Hollingsworth about Incident 4, where on or about December 7, 2021, Student B approached R. K. while he was standing in line in athletics and made a crude sexual and gay comment directed at him. Hollingsworth obtained a written statement from R. K. about Incident 4. Hollingsworth also received a statement from another student witness, who said "Student B always does stuff like that to Student A".

60.     Defendants failed to investigate this complaint of bullying and sexual harassment towards R. K.

**Complaint 6**

61.     R. K.'s parents later met with Superintendent Wilcox and Principal Akin to seek help for their son, and to encourage Defendants to act. Wilcox attempted to diminish Student B's behavior, calling it "deer camp talk." Wilcox suggested that the Kellys meet with Student B's stepfather, but Principal Akin suggested that was not a viable option.

62.     The Kellys were extremely concerned for the safety and well-being of their son as a result of this ongoing bullying and harassing behavior by Student B. The Defendants offered R. K. no supportive plan whatsoever in response to the numerous Complaints regarding the Incidents.

63.     Hours after that meeting with Wilcox, D. Kelly received a phone call from the stepfather of Student B, who had knowledge of the contents of their private meeting with Wilcox.

64.     On the phone with D. Kelly, Student B's stepfather made statements about the issues the Kellys had reported to WISD. That information appeared to have been shared by the Superintendent without their permission, in violation of the Family Educational Rights and Privacy Act (FERPA).

**Complaint 7**

65.     In or about December 2021, the Kellys met with Athletic Director Finney, pursuant to the Superintendent's recommendation, to seek his assistance in stopping Student B's harassment. The Kellys again pleaded with WISD staff for something to be done to stop the bullying and sexual harassment against their son.

66.     Upon information and belief, Defendants failed to investigate this complaint according to WISD Policy and Procedures, and by their own admission appear to have engaged in an informal resolution of Student B's behavior, without R. K.'s knowledge or consent.

67.     Athletic Director Finney simply had Student B sit out for two quarters at the next basketball game as punishment.

**Complaint 8**

68.     In or about April 2022, as he had been instructed by Counselor Hollingsworth, R. K. reported another incident, Incident 5, directly to Principal Akin. This Incident involved bullying by Student B, followed by a physical assault by Student D.

**Complaint 9**

69.     Shortly after R. K.'s assault by Student D, Incident 8, D. Kelly contacted Athletic Director Finney and demanded that WISD act regarding the unlawful behaviors towards his son.

70.     Director Finney facilitated a meeting with Student B's stepfather, including Finney, Coach Huffman, and D. Kelly. During that meeting, Coach Huffman said he had spoken with both R. K. and Student D, and that their statements were consistent - R. K. was threatened by Student D, Student B's best friend, for snitching on Student B, and was then physically assaulted by Student D. Then R. K. was threatened by Student D with additional future physical harm if he "snitched" on Student B again.

71.     D. Kelly added that Student B harassed R. K., asking why he likes "n*****s" and that he "likes to f*** n*****s." Huffman, Finney and Student B's stepfather moved on with the conversation and did not address these statements.

72.     During this meeting, Finney claimed that he was too busy to address R. K.'s situation, dismissing Student B's harassment of R. K. as "deer camp talk" (the same phrase that Superintendent Wilcox had used to attempt to diminish Student B's behavior). Finney also made comments that D. Kelly found to be offensive, especially in light of his son's disabilities. Finney stated that he was preparing for WISD's Autism Awareness Run, stating "How busy I was this morning? I've got a damn special Olympics with a bunch of retarded kids that I'm supposed to go out there and help." Finney made further offensive comments while attempting to end the meeting, "I've got a bunch of retarded kids out there that I am supposed to be out there on the track with them painting their faces today."

73.     During the meeting those present had conversations about the leadership within the WISD athletic program.

74.     Plaintiff D. Kelly was unhappy with the conversation. No plan was formulated by WISD staff regarding how WISD would provide support to his son, and how they would investigate, adjudicate, and resolve his son's Complaints. D. Kelly informed Finney that he planned to take his concerns to the School Board on the following Monday.

75.     During a phone call after this meeting, D. Kelly informed Finney that D. Kelly informed Finney that he believed there was a conflict of interest between Superintendent Wilcox, Athletic Director Finney, and Student D's stepfather. Specifically, Superintendent Wilcox is Finney's direct supervisor, yet Wilcox and Finney were in a cattle venture together. Moreover, WISD was in the process of approving a 3.5-million-dollar meat processing facility. Wilcox's adult daughter was also dating Student B's adult stepbrother. Both Wilcox and Finney had a close friendship with Student B's stepfather.

14

76.     In or about May of 2022, Board Secretary Duncan McAdoo ("McAdoo"), who is also a banker in Winnsboro, attempted to convince D. Kelly that Wilcox and Finney did not have a conflict of interest because they had no joint cattle venture. McAdoo had financed Wilcox's cattle business, and he claimed to have inside knowledge that Finney was not involved. McAdoo also repeated the false statement that R. K. deserved to be assaulted because he provoked a special education student.

**Complaint 10**

77.     On April 25, 2022, D. Kelly made a public comment before the School Board. He expressed to the Board his concerns and complaints about WISD's failure and refusal to address the bullying and sexual harassment behaviors against his son R. K.. He asked the School Board to investigate the conflicts of interest between Superintendent Wilcox, Athletic Director Finney, and Student D's stepfather. He expressed his concern that this conflict of interest may be interfering with WISD's investigation, adjudication, and resolution of the Complaints. Sexual harassment, bullying, conflicts of interest, and improper leadership of a school district are all matters of public concern that merit public comment by parents at school board meetings.

78.     D. Kelly provided each Board Member with a printed copy of his public comments, along with a copy of the December 5, 2021, Bully Report given to WISD.

79.     After the open session of the School Board meeting, unbeknownst to the Kellys at the time, an off the record, closed session occurred, including Wilcox and Finney, who allegedly coordinated to include Coach Huffman, Counselor Hollingsworth and Principal Akin. However, the minutes of that Board meeting were later altered to hide the existence

of that closed session. Board President Brandon Green and then Board Secretary Brian Busby certified those falsified minutes.

80.     Upon information and belief, during this closed session meeting, Finney and Huffman provided false statements to the Board, undermining D. Kelly's testimony of sexual harassment and disparaging R. K.. These fabrications permitted WISD to cover for the poor handling of the assault and sexual harassment that had been occurring on campus. This closed Board meeting discussing the sexual harassment and bullying of R. K. violated Title IX and WISD Policies and Procedures regarding investigation and hearing requirements. The closed meeting was also a violation of the Notice requirements in the Texas Open Meetings Act. Texas Government Code, Chapter 551, VII. Notice Requirements A. Content; B. Sufficiency ("Open Meetings Act").

81.     In that closed session School Board meeting, Finney and Huffman also falsely alleged that R. K. deserved to be assaulted because he was provoking a special education student at the time of the assault. Finney and Huffman allegedly also stated that the Kellys were *difficult parents* for the school to deal with, and that R. K. was a *problem student*. These statements were a direct contradiction to Finney and Huffman's prior statements to D. Kelly, where he stated that the Kellys were good parents, and that R. K. was a well-behaved student. Since S. Kelly was a WISD employee at the time, this closed session, without notice to her, may have also violated Section 551.074, Personnel Matters, of the Open Meetings Act.

**Complaint 11**

82.     On May 4, 2022, D. Kelly spoke again before the School Board seeking action to be taken in regard to the harassment of his son. He informed the Board that Superintendent

Wilcox had inappropriately contacted his employer in retaliation for exercising his first amendment right to speak at the previous Board meeting. He expressed concerns that Superintendent Wilcox was attempting to silence him, and that he feared Wilcox would retaliate further by impacting his wife's employment with WISD. Immediately following D. Kelly's public comment, Student B's family addressed the Board and asked for S. Kelly to be terminated.

## Complaint 12

83.     On May 11, 2022, in an interview with WISD's attorney, S. Kelly reported, yet again, the ongoing harassment, bullying and discrimination towards her son R. K. by other students.

## Complaint 13 - Office for Civil Rights Complaint for Failure to Investigate

84.     On March 28, 2023, Plaintiffs filed a complaint with the U.S. Department of Education, Office for Civil Rights, alleging that WISD failed to appropriately respond to multiple complaints of sexual and disability-based harassment against the Plaintiff R. K., and then retaliated against Plaintiffs for their complaints regarding WISD's failure to investigate their complaints against their son, in violation of Title IX and the ADA Title II.

85.     On December 14, 2023, Plaintiffs received a letter from the Office for Civil Rights, informing them that their March 28, 2023, complaint against WISD would be investigated, including claims of discrimination based on sex and disability, as well as claims of retaliation against the Kellys.

86.     A Department of Education, Office for Civil Rights, Dear Colleague Letter, April 24, 2013, states:

The ability of individuals to oppose discriminatory practices, and to participate in OCR investigations and other proceedings, is critical to ensuring equal educational

opportunity in accordance with Federal civil rights laws. Discriminatory practices are often only raised and remedied when Student As, parents, teachers, coaches, and others can report such practices to school administrators without the fear of retaliation. Individuals should be commended when they raise concerns about compliance with the Federal civil rights laws, not punished for doing so.

The Federal civil rights laws make it unlawful to retaliate against an individual for the purpose of interfering with any right or privilege secured by these laws. If, for example, an individual brings concerns about possible civil rights problems to a school's attention, it is unlawful for the school to retaliate against that individual for doing so. It is also unlawful to retaliate against an individual because he or she made a complaint, testified, or participated in any manner in an OCR investigation or proceeding. Thus, once a Student A, parent, teacher, coach, or other individual complains formally or informally to a school about a potential civil rights violation or participates in an OCR investigation or proceeding, the recipient is prohibited from retaliating (including intimidating, threatening, coercing, or in any way discriminating against the individual) because of the individual's complaint or participation.

## III.   Plaintiff R. K.'s Section 504 Disability

87.     In or about the spring semester of 2021, R. K. was screened for and tested positive for an anxiety disorder, due to the bullying and sex-based/disability-based harassment he had experienced, leading him to seek counseling.

88.     The CHADIS Detail Report[3] that the Kellys received contained positive results, based on their son's reports, of anxiety disorder, generalized anxiety disorder, and separation anxiety disorder. This documentation was submitted to WISD, and R. K.'s file noted these disabilities.

89.     On April 24, 2023, S. Kelly sent an email to the 504 Committee, which included Special Education Director and 504 Director Casey Monds ("Monds"), and Assistant Superintendent and Title IX Coordinator Aaron Nation ("Nation"), attaching correspondence and documentation that she requested to be included in R. K.'s 504 file. The documentation in the email contained direct evidence contradicting the testimony and

---

[3] CHADIS questionnaires help a child's doctor review their health and development. CHADIS (April 30, 2024), https://www.site.chadis.com/parent-faqs.

claims compiled by WISD and presented against R. K., S. Kelly, and D. Kelly at S. Kelly's non-renewal hearing.

90.     On April 24, 2023, S. Kelly met with Nation, Monds, and four (4) of R. K.'s teachers, for a 504 meeting. The purpose of the meeting was to identify how WISD's retaliation and misrepresentations of the facts had significantly impacted her son's educational environment, specifically identifying WISD employees Wilcox, Finney, Nash, and Hollingsworth. The goal was to find a healthy path forward for her son and her family.

91.     Nation was present during the April 24, 2023 504 meeting, and he provided no feedback and expressed no concern regarding S. Kelly's Complaints, concerns and requests regarding her son. S. Kelly was afforded only the opportunity to speak in this "listening session" but there was no discussion of the issues.

92.     S. Kelly attended the April 24, 2023, 504 meeting alone, without her husband, because he was blocked from parental participation in the 504-meeting due to a criminal trespass warning against him by WISD.[4] Despite this fact, Wilcox complained to D. Kelly's employer alleging that he had attended the meeting.

93.     In or about May 2022, Stefanie Pool ("Pool"), the WISD Junior High 504 Coordinator at the time, and the case manager for R. K.'s 504 file, assisted WISD in their retaliatory acts against R. K. and S. Kelly by providing them with false statements about them that were later included in the WISD attorney's report during the employment investigation of R. K..

94.     D. Kelly missed numerous 504 meetings regarding his son because he was given a trespass warning and prohibited from going on WISD campus.

---

[4] The criminal trespass warning issued against D. Kelly is discussed in more detail below.

**IV.     Defendants Retaliated Against R. K. for the Complaints**

95.     On April 28, 2022, unbeknownst to the Kellys at the time, Superintendent Wilcox, acting as the records custodian for WISD, released the Kelly's Bully Report directly to Student B's mother. Wilcox also emailed his secretary, who sent him and Principal Nash the forms necessary to file a complaint against S. Kelly as a WISD employee.

96.     The Bully Report contained personal identifying information regarding R. K., including his name, which Wilcox was prohibited from releasing to anyone due to his obligations under FERPA.

97.     Plaintiffs filed a complaint with the U.S. Department of Education's Student Privacy Policy Office regarding the unlawful December 2021 release of extremely sensitive information about their son to the public, in violation of the Family Educational Rights and Privacy Act.

98.     Defendants also made false statements about R. K., including statements made regarding R. K. teasing a special education student.

99.     Defendants also made false reports, creating a false permanent educational record for R. K., in a document created during an investigation of his mother S. Kelly's employment, stating that R. K. engaged in problematic behavior of the type that he was subjected to by Students B and D.

**V.     Defendants Retaliated Against S. Kelly for the Complaints**

100.     In the months after S. Kelly's December 5, 2021, email to WISD, Superintendent Wilcox did not mention any concerns of wrongdoing, targeting, harassment, or defamation by the Kellys in regard to the contents of the Bully Report email, or statements made by them, regarding Student B's behavior, although he later made those claims.

101.    In March of 2022, Superintendent Wilcox offered S. Kelly a position at the campus where the conduct cited in the Bully Report was taking place, with no mention of unprofessional conduct or concerns with S. Kelly being on the same campus as Students B and D.

102.    On or about April 1, 2022, S. Kelly was granted another contract of employment for the 2022-2023 school year.

103.    After D. Kelly's April 25, 2022, public comments before the School Board, Defendants retaliated against his wife, reporting her to the Texas Education Agency ("TEA") in direct retaliation for requests that Defendants afford her son R. K. his legally protected rights under Title IX, the ADA and WISD's own Policies and Procedures. This complaint was eventually deemed to be unsubstantiated by TEA.

104.    In April of 2022, Finney wrote a statement that was later submitted to S. Kelly's contract renewal hearing before the School Board, falsely claiming that he never met with R. K.'s parents prior to R. K.'s physical assault in April of 2022.

105.    On May 4, 2022, after D. Kelly spoke before the School Board seeking action to be taken in regards to the harassment of his son, and informed the Board that Superintendent Wilcox had inappropriately contacted his employer in retaliation for exercising his first amendment right to speak at the previous Board meeting, Student B's family also addressed the Board and asked for S. Kelly to be terminated.

106.    On May 5, 2022, Superintendent Wilcox informed S. Kelly's Pprincipal at the time, Kim Nash, that a formal complaint against S. Kelly had not been filed, but that if one were filed the district would investigate.

107.    On May 6, 2022, the family of Student B filed a complaint with WISD against S. Kelly, referencing as grounds for their complaint the contents of the confidential Bully Report that she had filed about their son Student B, which had been released to them by Superintendent Wilcox.

108.    On May 9, 2022, S. Kelly received notification that she was under investigation for harassment, slander, and defamation due to reporting Student B's behavior to WISD. The notification advised that an attorney hired by the school would be conducting the investigation and that she was under a directive not to communicate about the investigation. Later that day, Student B approached another student and attempted to convince him that Student A had been calling him the "n-word." Because Student B had already been bragging to Student A about Student B's relative's status as ranking members of the Ku Klux Klan in the Winnsboro area and was now spreading damaging racial information about Student A, D. Kelly requested a meeting with Counselor Hollingsworth and Principal Akin. D. Kelly asked for the incident to be documented. S. Kelly felt she could not report the incident herself because her job was already in jeopardy due to reporting the Complaints.

109.    Pool, the 504 Coordinator in charge of R. K.'s 504 case, assisted WISD's attorney in the retaliatory investigation of R. K., by providing false statements about R. K. and S. Kelly.

110.    In or about the middle of May 2022, WISD Board Member Brian Busby was discussing the Kellys' situation in town, and allegedly stated that the WISD School Board intended "to go after the Kellys" because of D. Kelly's public comments before the School Board.

111.    On June 6, 2022, S. Kelly informed Superintendent Wilcox that for the past month she was under a directive not to communicate with anyone about her employment investigation. She requested for that order to be lifted. Wilcox replied, "I am not sure who you need to talk to, but you can talk to people who need to know about the investigation. I hope that you do not further complicate the situation where more community members lose confidence in you. You should not be speaking about other students for a number of reasons. Does this answer your question?"

112.    On June 9, 2022, S. Kelly received the results of the investigation against her for slander, harassment, and defamation. The witnesses listed in the report included the faculty who received the December 5, 2022, Bully Report, and the staff who participated in the April 22, 2022, assault.

113.    The June 9, 2022, report focused on the contents of the confidential Bully Report that Superintendent Wilcox had released to Student B's mother and included many incorrect assertions. The report was not objective and neglected to include pertinent documentation provided by S. Kelly that corroborated her position. Documentation that was mischaracterized or omitted included text message records, physician records, 504 records, disciplinary records, and affirmative statements of witnesses. The report cited ambiguous claims that S. Kelly violated law and policy without meeting any burden of proof, and included a significant investigation into her son, R. K., although he had nothing to do with her position at WISD.

114.    The June 9, 2022, report contained comments on the conflict of interest reported by D. Kelly, citing that Wilcox and Finney shared in their interviews that they do have cows in the same pasture, and that they take turns buying feed and splitting the cost. The report

further states that this sharing of the same pasture provides no evidence of a conflict of interest, and that the "Kellys therefore provided no direct evidence to support their conflict-of-interest claim." In or about the same time of this interview and investigation by the WISD attorney, Wilcox and Finney were allegedly liquidating their cattle holdings.

115.   Notably, even though the June 9, 2022, report against S. Kelly included false claims, erroneous information, and outright lies in the conclusions of the report, the WISD attorney did not recommend S. Kelly's non-renewal or termination of her employment with WISD in her recommendations.

116.   The investigation into her son R. K. included an inquiry into his student records and interviews of WISD staff as witnesses, including Superintendent Wilcox and Athletic Director Finney. Though the report into R. K. did not identify which witnesses provided the content in the report, the problematic conduct attributed to her son in the report is the very behavior that D. Kelly told Athletic Director Finney that Student B had been doing to her son.

117.   The alleged testimony by Athletic Director Finney at the closed School Board meeting session was not attributed to Finney in the report. The same allegations against R. K. were documented, including the false allegation that the assault against R. K. was the result of him provoking a special education student, and that R. K. used racial slurs. The report described an incident where R. K. engaged in inappropriate sexual contact. The sexual contact as described in the report would be considered criminal according to Texas Penal Code, however, it was not reported until the Kellys publicly raised matters of public concern to the School Board.

118.     In response to the employment investigative report on S. Kelly, and the criminal allegations against R. K., his father, D. Kelly, advised WISD school law enforcement that his son should be investigated and punished if the allegations in WISD's report were true. Wilcox was in a position to consult with WISD staff about the conduct cited in the report, and correct the record, especially since Wilcox had allegedly been advised that the allegation was not true. However, instead, Wilcox contacted the Texas Rangers[5] to report D. Kelly's requested law enforcement inquiry into the sexual contact claimed against R. K. in the WISD report.

119.     After the Texas Rangers determined that there was no cause to initiate a criminal investigation, S. Kelly spoke with then Principal Akin, who acknowledged that there was no improper sexual conduct by R. K., as stated in the report. S. Kelly asked Wilcox, Finney, and Huffman to correct the inaccurate "educational record" portion of the report that was harming the reputation and record of her son. Neither Finney nor Huffman provided any response. Wilcox refused to correct the educational record maintained by WISD and advised that "the district does not have any additional statements to give you."

120.     On July 27, 2022, S. Kelly met with Superintendent Wilcox, during which he informed her that she would be placed on administrative leave for the 2022-2023 school year, and effectively banned from the school campus. This was later confirmed by Wilcox in writing to S. Kelly in an undated letter, stating that she was being placed on administrative leave, with pay, until further notice. The letter stated, "This decision was not made without considerable thought. After discussions with WISD staff, it has become

---

[5] The Texas Rangers are an elite group of law enforcement officer that fall under the Department of Public Safety. They have specialized training and responsibilities and have jurisdiction over the state and other police departments.

clear that *your presence at WISD is a disruptive factor* for the students and staff. It has become clear to me as Superintendent that *you have failed to follow Board policies* and expected employee *standards of conduct*." (emphasis added). The letter did not state that any investigative process had taken place, nor did it specify which Board policies and standards of conduct S. Kelly had allegedly violated.

121.    The letter informed S. Kelly that she was "not to attend school activities, functions or events" and should "not enter a school building without giving a request in writing," despite the fact that she had two children who were still students at the school. She was instructed to "drop off your students for school in the morning and pick them up in the afternoon." She was forbidden to have "contact with students concerning the student's official records maintained by the District" and was not allowed "to counsel students regarding their school matters." She was granted permission to attend her son R. K.'s Admission, Review and Dismissal committee meetings regarding his Section 504 status, however only at times and places "set in advance of your coming upon school property".

122.    S. Kelly was not even given the opportunity to go back to her office to gather her personal items, without making a prior appointment and being accompanied by a police escort.

123.    On August 5, 2022, WISD held a School Board meeting, but S. Kelly was unable to attend this Board meeting due to her administrative leave and ban from campus. D. Kelly was also unable to attend this Board meeting because of the criminal trespass warning that banned him from campus.

124.    On August 9, 2022, WISD held school orientation for the start of the new school year, but S. Kelly, per Principal Kim Nash, was unable to attend this orientation due to her

administrative leave and ban from campus. D. Kelly was also unable to attend this orientation because of the criminal trespass warning that banned him from campus.

125.    On August 11, 2022, WISD held an athletic assembly, but S. Kelly was unable to attend this assembly due to her administrative leave and ban from campus. D. Kelly was equally unable to attend this assembly because of the criminal trespass warning that banned him from campus.

126.    On August 15, 2022, WISD held a School Board meeting, but S. Kelly was unable to attend this Board meeting due to her administrative leave and ban from campus. D. Kelly was also unable to attend this Board meeting because of the criminal trespass warning that banned him from campus.

127.    Less than a month after S. Kelly was suspended, WISD arranged for Pool, who had provided false statements above R. K. and S. Kelly to the investigators, to receive an emergency counseling permit and gave her a promotion to step into S. Kelly's former employment position at WISD. In addition, after S. Kelly's suspension Principal Nash was also given a promotion to run the WISD Junior High campus with Hollingsworth.

128.    These measures taken by Defendants to prevent both the Kellys from taking an active role in their children's education were not proportional or reasonable given the totality of the circumstances. WISD has publicly and privately, verbally and in writing, *mis-represented* both of the Kellys as engaging *disruptive behavior*.

129.    On or about August 31, 2022, S. Kelly was contacted by her church Pastor, David Rose, who advised her that Board Secretary Duncan McAdoo had contacted him and requested that he present S. Kelly with an offer from the Board. The offer presented to her by her Pastor sought for S. Kelly to resign, and in exchange for her resignation, she and

her husband would be permitted back on campus for their children's activities. S. Kelly advised Pastor Rose that she had done nothing to warrant being terminated and had reported harassment and assault according to law and policy. She informed Pastor Rose the proper channel for the school to submit any offers to mediate the situation would be to her employment attorney.

130.    On September 7, 2022, after S. Kelly filed a grievance asking for a public hearing before the School Board, she was given permission to be on campus for her children's activities *under the condition* that she withdraw her grievance requesting the public hearing.

131.    On or about the week prior to September 19, 2022, S. Kelly received a phone call from a business owner in her town who said to her that Board Member Brian Busby told the business owner to "stay away from the Kelly's because we are about to drop a bomb on them".

132.    On February 17, 2023, at a WISD Board Meeting, the Board went into closed session to address the complaints against S. Kelly and voted to not renew her contract for the upcoming 2022-2023 school year.

133.    Coach Huffman's wife, Victoria Huffman, was a teacher on the same WISD campus as S. Kelly and testified at that Board Meeting against her employment contract being renewed. Upon information and belief, during her testimony Ms. Huffman described S. Kelly's alleged failures as a counselor but recanted when she was shown her own text messages that contradicted that testimony.

134.    In S. Kelly's notice of non-renewal, WISD stated that if she challenged their decision to not renew, new allegations against her would be brought forward that were not

contained in the WISD attorney's report. Specifically, it was stated that Wilcox, Nash, Hollingworth, Olevia Matthews, Ms. Huffman, and Student B's mother would testify against S. Kelly about those new claims.

135.    S. Kelly requested a public hearing for WISD to present the evidence compiled against her since reporting harassment, assault, etc. As a result of S. Kelly requesting a public hearing, Superintendent Wilcox again complained to D. Kelly's employer even though D. Kelly had not been on campus or spoken to WISD staff since July of 2022 and S. Kelly's employment was the sole subject of the hearing.

136.    On March 10, 2023, a special School Board meeting was called to hold a public hearing regarding S. Kelly's non-renewal of her employment contract with WISD. The Board voted to not renew her employment contract with WISD, based on fabricated reasons, despite her successful nine-year career with WISD, with no record of any negative record with WISD. S. Kelly did not call any witnesses at the non-renewal hearing out of fear that WISD would retaliate against them for their testimony.

137.    On March 13, 2023, the Board sent S. Kelly a letter confirming the board's March 10, 2023, vote to not renew her employment contract, stating that she would remain on administrative leave for the remainder of 2022-23, with no assigned duties. The letter also stated that she could attend her children's activities at the school as a parent.

138.    On March 20, 2023, Student B picked up Student A and slung him into a wall in the cafeteria. S. Kelly followed up with WISD and asked to see the video because D. Kelly was not permitted on campus, and any interactions with WISD may trigger additional complaints against his employment. S. Kelly was allowed to view a video but was not allowed to obtain a copy of it. The video shown was from one of the cameras that was the

farthest across the room. Although the quality of video was poor, you could still clearly see Student B approach Student A, grab him, pick him up and sling him against the wall. Since WISD would not release a copy of the video to Student A's parents, S. Kelly asked them to preserve it. Principal Nash oddly claimed that Student A was not aware that his face was swollen until someone else noticed it. It was further suggested that Student A would not have hit the wall as hard if he had not been holding on so tightly to his seat when Student B grabbed him. Principal Nash reported to them that the incident was just a misunderstanding about french fries that caused Student B to sling Student A against the wall. Because of WISD's failure to provide support for Student A, and WISD's retaliatory actions against him, Student A was not in a position to defend himself. Student A gathered his belongings and left the seat he was sitting in, knowing that any attempt to defend himself or report the incident would be used by Principal Nash to punish Student A.

139.    In or about April of 2023, WISD Board Member Stacey "Chip" Brown stopped by a local business where D. Kelly was inside. Brown told D. Kelly that his wife lost her job because of D. Kelly's public comment before the School Board. D. Kelly advised Brown that public comment before the School Board is constitutionally protected first amendment free speech, and Brown replied that he could not do anything about it.

140.    On April 14, 2023, S. Kelly received a Written Notice of Investigation from Paul Morales at the Texas Education Agency ("TEA"), informing her that the State Board of Educator Certification (SBEC) received information that could impact her Texas educator certificate. She was put on notice that the Educator Investigations Division opened an investigation of her, pursuant to 19 Texas Administrative Code (TAC) Section 249.14. The letter specified that the allegations against her were regarding her release of "personally

identifiable information of a student." She was also informed that an investigation notice would be placed on her online certification record, and remain there during the investigation, unless she can show cause, in writing, within ten days, why the notice should be removed.

141.    On August 3, 2023, S. Kelly received a letter from Paul Morales at the TEA Educator Investigations Division regarding their investigation of her. Morales stated that the information they received indicates that she "may have engaged in conduct detrimental to the welfare of the children of the State of Texas as referenced in 19 Texas Administrative Code (TAC), Sections 230 and 249, et. seq." Specifically, that she provided "personal identifiable information of a student." The letter further stated that if this is true, then "this conduct raises the issue of your fitness to retain your teaching credentials issued by TEA on behalf of the State Board for Educator Certification (SBEC)."

142.    S. Kelly was given notice of an August 15, 2023, informal conference to be held over the phone on video, where she could submit a statement. She was also given the option of responding in writing instead. She was informed that if she could not show at this informal conference that she complied, the investigation would proceed formally before the SBEC. She was also informed in this letter that if she voluntarily surrendered her SBEC certificate, they would close the investigation.

143.    On August 15, 2023, S. Kelly spoke with TEA Investigator Morales on the phone, and he told her that WISD had sent over a "shoebox of information" against her.

144.    On August 28, 2023, S. Kelly received an email from Morales at TEA regarding her investigation. Morales offered her an "Inscribed Reprimand" to resolve the matter, and she could either sign the Agreed Final Order provided or decline the offer and the matter

would be sent to the Legal Division with a recommendation of a written Inscribed Reprimand, and the institution of formal disciplinary proceedings. She was informed that if she declined the offer, the case would be assigned to one of their attorneys, and the case would be heard at the State Board for Administrative Hearings, where an Administrative Law Judge would make the final recommendation on the sanctions against her teaching certificate.

145.    On August 28, 2023, S. Kelly asked Morales if there was a possibility that an Administrative Law Judge could declare no sanctions be taken against her certificate. Morales responded that was possible but stressed that a more severe sanction could also be imposed, including a Suspension or Revocation of her certifications.

146.    On August 28, 2023, S. Kelly asked Morales by email to provide her with the evidence and reasoning that supported the Inscribed Reprimand, but he responded only with a statement that the decision was made "due to the board policy violations". She declined the offer to accept the Inscribed Reprimand and stated, "Since reporting sexual harassment to the District and addressing matters of public concern, WISD has retaliated in every manner possible, including the compilation of the perjurious material provided for your review. I understand that SBEC can only decide with the information provided by WISD and I must respectfully decline the offer for the inscribed reprimand."

147.    In or about September 2023, S. Kelly received a phone call unexpectedly from Jonathan Crabtree ("Crabtree"), an attorney for TEA, regarding her investigation. Crabtree pressured Kelly to take the written reprimand, threatening that if she declined he would ask the Administrative Law Judge to suspend her certification. Crabtree informed her that WISD sent him "at least 1200 pages" and that "it doesn't look good." She again declined

the offer and. Crabtree informed her that she could expect an appeal via email before the end of October.

148.    On October 5, 2023, a few weeks after the September 2023 phone call with Crabtree, S. Kelly received an email informing her that the investigation against her by the TEA was completed, that it was deemed "not to warrant further action", and that it was closed. The email was sent to her from Anna Amaro, with a copy to Crabtree.

149.    On October 9, 2023, S. Kelly made a formal records request for the "shoebox of information" against her, seeking "all documentation provided by WISD to TEA regarding" her investigation, including "any associated correspondence". She was provided various email correspondence that she already had, but there were four (4) pages that the TEA withheld under FERPA. It is unclear why those documents were not simply redacted, so as to not show the names of the students that were being protected by FERPA. No explanation or description of the documents that were withheld was given to S. Kelly. Suspiciously, the documents provided amounted to merely a handful, rather than a "shoebox." There are only two possibilities, either there were no additional documents and S. Kelly had been threatened by the Investigator and Attorney involved with her case, or alternatively there were numerous documents that have been unlawfully withheld from S. Kelly.

**VI.    Defendants Retaliated Against D. Kelly for His Complaints**

150.    Prior to the filing of the complaints in the Bully Report, the Kellys had not experienced any complaints about their parenting, their professional conduct, or their children's conduct outside of routine school discipline.

151.    When Plaintiff D. Kelly publicly complained to the School Board on April 25, 2022, about the sexual harassment and bullying towards his son Student A, rather than

beginning an investigation in compliance with Defendants' legal obligations under federal law and WISD's own policies, Defendants chose instead to retaliate by reporting Plaintiff D. Kelly to his employer. This complaint was later deemed unsubstantiated.

152.    On April 28, 2022, Superintendent Wilcox contacted D. Kelly's employer, identified himself as the Superintendent of WISD, and verbally complained to D. Kelly's supervisor about his School Board address in order to intimidate him from continuing to speak publicly.

153.    In or about the middle of May 2022, WISD Board Member Brian Busby was discussing the Kelly's situation in town, and allegedly stated that the WISD School Board intended "to go after the Kellys" because of D. Kelly's public comments before the School Board.

154.    On May 19, 2022, Superintendent Wilcox submitted a lengthy complaint to D. Kelly's employer citing multiple allegations, identifying himself as the Superintendent of WISD, and attaching the Bully Report as evidence. Wilcox had access to the Bully Report in his professional capacity as the WISD Superintendent and records custodian. Wilcox had previously expressed no concerns to the Kellys regarding this December 2021 Bully Report before filing a complaint about it to D. Kelly's employer. Wilcox's complaints were only initiated after D. Kelly raised matters of public concern with the School Board in April 2022.

155.    The Department of Public Safety ("DPS"), Office of the Inspector General ("OIG"), later determined that Wilcox's complaint was unfounded.

156.    On July 26, 2022, D. Kelly met with Counselor Hollingsworth at the WISD Junior High Campus. After D. Kelly requested changes to his son's 504 accommodations due to

the WIDS's Board Meeting held in violation of Texas law, he referenced the April 25, 2022 off-the-record, closed session meeting of the School Board, and that it was problematic for Counselor Hollingsworth to support false testimony against Student A, while knowing the truth. D. Kelly asked Counselor Hollingsworth not to counsel either of the children of the Kellys, due to her lack of truthfulness.

157.    Though the discussion between D. Kelly and Hollingsworth was cordial, D. Kelly was served a criminal trespass warning by WISD Police Chief Jody Hettich hours after the meeting. WISD again retaliated by complaining to D. Kelly's employer, and banned S. Kelly from campus the following day, banning both parents from the campuses where their children attended school.

158.    Superintendent Wilcox requested D. Kelly be served with the criminal trespass warning to keep D. Kelly off all WISD property, due to D. Kelly "threatening" employees. Chief Hettich had not reviewed any evidence of wrongdoing and did not take a statement from D. Kelly prior to giving him the criminal trespass warning without due process. D. Kelly was not provided with the statutory appeal process identified in the Texas Education Code for parents to follow in order to return to campus. Wilcox submitted another complaint to the OIG with DPS in reference to the claims by WISD used to issue the criminal trespass warning against D. Kelly. The Inspector General's Office determined that the complaint was unfounded.

159.    On August 5, 2022, Superintendent Wilcox, Assistant Superintendent Aaron Nation, and WISD Board President Brandon Green, met with the DPS investigator who was conducting the inquiry into Superintendent Wilcox's claims of misconduct by D. Kelly, and the criminal trespass warning preventing D. Kelly from being on campus with

his children. During the meeting, Wilcox and Green relayed to the DPS investigator that they would be amendable to dropping the criminal trespass warning and D. Kelly being welcomed back to WISD campuses if D. Kelly would stop advocating for WISD to address his concerns.

160.    The Defendants' banning of the Kellys from campus infringes on their rights and constitutes yet another instance of WISD's retaliation in response to them reporting matters of public concern in a public forum. WISD used the criminal trespass law in Education Code 37.123 as a weapon of retaliation.

161.    On August 30, 2022, Superintendent Wilcox allegedly held a meeting with the WISD administrators from each campus in reference to the Kellys' situation. The administrators then held subsequent staff meetings at each of the four WISD campuses. Board President Brandon Green's wife, Principal Lori Green, allegedly told the staff of the WISD Elementary campus that President Green had to make some tough decisions and WISD staff should "back WISD or find employment elsewhere." Principal Nash and Counselor Hollingsworth allegedly held a staff meeting on the WISD Junior High Campus where Student A and Student C attend school.

162.    During their staff meeting, Principal Nash and Counselor Hollingsworth portrayed D. Kelly's behavior to campus staff as well as his advocacy on behalf of his son, as "abusive," and described D. Kelly as someone who the staff should be afraid of. In a subsequent 504 meeting, D. Kelly addressed this mischaracterization of him by Nash and Hollingsworth to the staff, who teach Student A with the 504 committee. He also expressed concern that the lies and mischaracterizations by Principal Nash and Counselor Hollingworth had significantly affected Student A's parent/teacher relationship, thus

negatively affecting Student A's Free Appropriate Public Education (FAPE). During the meeting, Principal Nash, who was on the 504 committee, failed to provide any response to D. Kelly's concerns, and simply looked down at the table in front of her until the committee changed the subject.

163.    On or about the week prior to September 19, 2022, a business owner in D. Kelly's town contacted him and informed him that Chad Tedford was requested to testify at the upcoming School Board meeting regarding an incident the two participated in back in 2018. This business owner had knowledge of the facts behind the incident because D. Kelly had discussed it with him four (4) years prior after it happened. This phone call occurred around the same time that S. Kelly had received the phone call from another business owner in her town who said to her that Board Member Brian Busby told the business owner to "stay away from the Kelly's because we are about to drop a bomb on them."

164.    On September 19, 2022, the WISD School Board held a scheduled meeting. Prior to the meeting, WISD posted a notice online that the location had been changed, and that online streaming would not be available to the public as was routine. Once the meeting started, WISD allegedly coordinated for a parent, Chad Tedford ("Tedford"), whom D. Kelly interacted with in his professional capacity as a police officer to testify about him. Tedford is the husband of Monica Tedford, Principal Lori Green's Secretary. Tedford inaccurately described a situation from 2018 in which D. Kelly utilized his duty weapon to prevent the parent from assaulting D. Kelly while he was on duty. The board permitted this inaccurate testimony regarding a circumstance that occurred four (4) years prior, to bolster WISD'S assessment that D. Kelly should not be permitted on campus for "safety reasons".

165.    D. Kelly was not allowed to be present or to testify at the Board meeting where WISD coordinated to smear his professional actions as unreasonable and dangerous. To date, the public testimony of Chad Tedford is still not documented in the falsified WISD Board minutes certified by Board President Green and Board Secretary Duncan McAdoo.

166.    In addition to missing the aforementioned Board meetings and school activities that S. Kelly also missed, due to the Defendants banning them both from campus, D. Kelly also missed the following, as a direct result of the bogus criminal trespass against him:

167.    September 8, 2022 – Student A's football game and daughter's pep rally

168.    September 20, 2022- Student A coaching youth football

169.    September 22, 2022- Student A's football game and daughter's pep rally

170.    September 27, 2022- Student A coaching youth football

171.    October 6, 2022 – Student A's football game and daughters pep rally

172.    In or about October 2022, citizens concerned about D. Kelly missing his childrens' activities and educational environment reached out to multiple WISD board members to see what could be done to get D. Kelly back on campus. In response, Board Secretary McAdoo consulted with President Green and informed him that D. Kelly would be permitted back on campus if S. Kelly resigned from her position at WISD.

173.    Due to the circumstances imposed upon him by the Defendants, D. Kelly was not able to take his children to school or to pick them up from school or school activities. If D. Kelly was even a passenger in a vehicle going to WISD to pick up his children, he must get dropped off outside of the boundaries of campus, wait for the vehicle to enter WISD property to pick up children, and return to the vehicle once outside the boundaries of campus. D. Kelly cooperated with the criminal trespass warning issued by WISD, and

waited off campus, in local businesses, or parking lots, for his children to be dropped off or picked up from school. Nevertheless, D. Kelly received multiple complaints against his employment from WISD staff. These complaints accused D. Kelly of engaging in law enforcement tactics by simply standing by and waiting for his children to be transported. He was accused of stalking and being a threat by strictly following the trespass warning.

174.    On September 23, 2022, D. Kelly provided each member of the School Board with the audio recording and statements associated with the criminal trespass. In response, Superintendent Wilcox emailed D. Kelly, unreasonably informing him that he would only address the criminal trespass *under the condition that* they simultaneously also addressed the issues affecting his son Student A, and the issues involving S. Kelly's employment. D. Kelly advised that an employment attorney represented S. Kelly, and he could not comment on her situation.

175.    On October 4, 2022, because Superintendent Wilcox would not discuss the criminal trespass without using it as a bargaining chip on other matters, D. Kelly submitted an official grievance to appeal the criminal trespass, seeking a public hearing. Wilcox responded by saying he would sit down to discuss the matter with D. Kelly on October 27, 2022. He feared that Wilcox would make further false accusations to his employer, so he invited his second level supervisor to attend the meeting with him as a witness, and notified Wilcox accordingly.

176.    Prior to that scheduled meeting with D. Kelly and his supervisor, Superintendent Wilcox unilaterally engaged in meetings with D. Kelly's supervisors, making additional accusations of malfeasance against D. Kelly and his employer, including new accusations against the second line supervisor who was scheduled to attend the meeting. That

supervisor subsequently withdrew from the meeting, leaving D. Kelly in a position to attend alone.

177.    To prevent the risk of further false complaints and reputational damage to D. Kelly and his employer, he felt threatened, intimidated, and compelled to withdraw his grievance requesting to be on campus with his children. He chose to discontinue all communications with Defendants. Wilcox had already submitted two complaints to D. Kelly's employer, and publicly released a mischaracterized statement about him, including the identity of his employer. D. Kelly could not provide any further opportunities for Wilcox to harm the security of his employment and was faced with no further options to address the criminal trespass with the school.

178.    On or about July 26, 2023, D. Kelly was notified by WISD that the criminal trespass warning issued to D. Kelly by Chief Hettich had reached its one-year expiration, and that he would be permitted on campus. D. Kelly missed over fifty campus events, including all of his children's home sports evenings such as basketball, football, track, wrestling, cheerleading, as well as opportunities to coach or play with his children at practice. D. Kelly had also been prohibited from attending S. Kelly's non-renewal hearing, all 2022-2023 home campus School Board meetings, open houses, 504 meetings, award ceremonies, and Student A's eighth grade graduation ceremony.

## VII.    Plaintiffs Continue to Fear Retaliation

179.    The Kellys hoped to raise their family peacefully in the small community of Winnsboro. They have struggled to maintain a sense of normalcy in the wake of bullying, discrimination, harassment and retaliation against their son, unanswered pleas for assistance from WISD, and continued retaliation, including the loss of S. Kelly's career.

180.    Plaintiffs never expected to be targeted by the school district for reporting these issues. This targeting has created a divide in the small community where they live and has resulted in their becoming targets of some hostile community members.

181.    Although D. Kelly's employment has survived the Defendants' direct and unlawful retaliatory efforts to have him removed from his position, S. Kelly has been unable to find a job in her chosen profession.

182.    The harassment, discrimination, and retaliation the Plaintiffs have experienced is legally actionable and continues to the date of the filing of this action.

183.    The Kellys and their family continue to be afraid of further retaliation.

## VIII.    Defendants' Student Conduct Handbook Prohibits Bullying, Sexual Harassment, and Retaliation

184.    WISD's Student Handbook requires both students and district employees to "treat peers and district employees with courtesy and respect, avoid offensive behaviors, and stop those behaviors as directed. District employees are likewise expected to treat students with courtesy and respect." Winnsboro Junior High School Student Handbook, 2023–24 School Year, p. 48 ("WISD Handbook"). [6]

185.    According to the Winnsboro Independent School District's Student Handbook for Junior High Students, WISD "strives to prevent bullying" by "building healthy relationships between students and staff," "encouraging reporting of bullying incidents," and "investigating and addressing reported bullying incidents." *Id*. at 37-39.

186.    WISD purports on its website home page to have other policies and procedures that are, upon information and belief, relevant to this action, but appear to have been removed

---

[6] Upon information and belief, the Winnsboro Junior High School Student Handbook for School Years 2021-2022 and 2022-2023 that apply to the timeframe relevant to this action contain sections on bullying, harassment and retaliation that are similar or identical to those contained in the 2023-24 WISD Handbook.

from the website.[7] The policies and procedures set forth in the WISD Handbook, and WISD's other established policies and procedures in effect during all times relevant to this action, are referred to herein as WISD's "Policies and Procedures".

**Bullying**

187.    The WISD school district purports in its Handbook to instruct students about bullying, discourage students from using bullying as a tool for social status, help students recognize that reporting bullying behaviors plays an important role in promoting a safe school community, and encourage peers to intervene when they observe bullying. *Id*. at 38.

188.    WISD allows for general, informal complaints and concerns to be addressed by a phone call or conference with a teacher or principal. Where more formal resolution is required, the WISD Board adopted a Student and Parent Complaints/Grievances Policy.[8] *Id*.

189.    The WISD Handbook also provides for meetings with the superintendent if complaints and grievances are not resolved, and appeal rights to the Board of Trustees if still unresolved. *Id.* at 45-46.

190.    The WISD Handbook defines bullying, consistent with Texas state law, to include a single or pattern of acts by one or more students directed at another student, which

---

[7] On May 22, 2024, counsel for Plaintiffs performed a search of the WISD website for policies and procedures and discovered a page entitled "Required Postings" that contained no postings or documents, and a page entitled "WISD Handbooks and Policies" that also contained did not contain the twelve (12) documents, referenced on the home page in the "Parents" section, that should be contained on that page, including the "Winnsboro ISD Board Policy Manual". *See* WISD Website, WISD Website, Required Postings (last visited May 22, 2024), https://www.winnsboroisd.org/page/required-postings; Handbooks and Policies (last visited May 22, 2024), https://www.winnsboroisd.org/page/wisd-handbooks-and-policies.
[8] The WISD Handbook refers to the "Student and Parent Complaints/Grievances policy at FNG(LOCAL)," and states that it is located on its website, but a search performed on May 26, 2024, by counsel for Plaintiffs was unable to locate this policy there.

exploits an imbalance of power, and involves written, verbal or electronic expression, or physical conduct that:

- Has the effect, or will have the effect, of physically harming a student, damaging a student's property, or placing a student in reasonable fear of harm to the student's person or of damage to the student's property;
- Is sufficiently severe, persistent, or pervasive enough that the action or threat creates an intimidating, threatening, or abusive educational environment for a student;
- Materially and substantially disrupts the educational process or the orderly operation of a classroom or school; or
- Infringes on the rights of the victim at school.

*Id*. at 37-39.

191.    WISD's Handbook states, "Bullying is prohibited by the district and could include: hazing, threats, taunting, teasing, confinement, assault … name-calling, rumor-spreading, or ostracism." *Id*. at 38.

192.    Cyberbullying is included in the WISD Handbook's definition of bullying, and includes acts through any electronic communication device, including a camera, a cellular phone, email, text messaging, or social media, among others. *Id*.

193.    The WISD Handbook expressly prohibits any retaliation against a student who reports an incident of bullying. *Id*. at 39.

194.    WISD Principal Kim Nash is listed as the point of contact for parents and students regarding these bullying policies. *Id*. at 37-38.

**Discrimination**

195.    The WISD Handbook defines discrimination as: "any conduct directed at a student on the basis of … sex, gender … disability, or any other basis prohibited by law that negatively affects the student." *Id.* at 49.

**Harassment**

196.    Harassment is defined in the WISD Handbook as: "threatening, intimidating, or humiliating conduct," "offensive jokes, name calling, slurs, or rumors," "physical aggression or assault," and "other kinds of aggressive conduct." *Id.* at 49.

197.    Such conduct must be "so severe, persistent, or pervasive that it affects a student's ability to participate in or benefit from an educational program or activity; creates an intimidating, threatening, hostile, or offensive educational environment; or substantially interferes with the student's academic performance." *Id.* at 49.

**Sexual Harassment**

198.    The WISD Handbook defines sexual harassment and gender-based harassment of a student to include: conduct "by an employee … or another student," such as "jokes or conversations of a sexual nature," or "other sexually motivated conduct, communications, or contact" that a reasonable person would construe as sexual in nature. *Id.* at 49-50.

**Retaliation**

199.    The WISD Handbook prohibits retaliation against a person who makes a good-faith report or participates in an investigation of discrimination or harassment, including threats, rumor spreading, ostracism, assault, destruction of property, or unjustified punishments. *Id*. at 49-50.

**IX.    WISD Grievance Procedures Required to Address Bullying, Harassment, and Retaliation**

200.    Defendants violated federal law and created a hostile environment for the Plaintiffs' entire family, by failing to follow a legally sufficient grievance process upon

44

receiving notice of Student A's complaints. This resulted in a cascade of retaliatory behavior towards all Plaintiffs, including, but not limited to, the allegations herein.

201.    WISD encourages students who experience bullying, or witness bullying of a student, to notify a WISD employee themselves, through a parent, or through the school's website [9]. WISD employees made aware of any such bullying *must* report it to an administrator. *Id.* at 39.

202.    The WISD administration is required by Title IX and its own Handbook to investigate any allegations of bullying and related misconduct. *Id*. at 39. WISD promises to take any appropriate disciplinary or criminal action if an investigation determines that bullying occurred. *Id*. at 39.

203.    The WISD Board established policies and procedures that prohibit inappropriate and offensive behaviors that are based on a person's sex, gender, or disability, and promise to promptly address those behaviors. *Id.* at 48, 50-51.[10]

204.    WISD policies allow for reports of such behaviors to be made by a student's parent. *Id.* at 50.[11]

205.    By WISD's own policies, an investigation must be conducted if the alleged behavior is prohibited conduct in the WISD Handbook. *Id.* at 50.

206.    The district will promptly notify the parent of any student alleged to have engaged in prohibited conduct. *Id.* at 50; WISD Policy FFH.

---

[9]    Winnsboro    ISD    Website,    Report    Bullying/Harassment    (visited    May    22,    2024), https://www.winnsboroisd.org/page/report-bullyingharassment.
[10] The WISD Handbook refers to the "WISD Policy FFH," but a search performed on May 26, 2024, by counsel for Plaintiffs was unable to locate this policy on the WISD website.
[11] The WISD Handbook refers to the "WISD Policy FFH(LOCAL) and (EXHIBIT)," but a search performed on May 26, 2024, by counsel for Plaintiffs was unable to locate this policy on the WISD website.

207.     Students who are bullied also may receive counseling options, *Id*. at 39, as also required by Title IX.

208.     WISD acknowledges in its Handbook its responsibilities under state and federal law, including pertaining to students with disabilities. *Id*. at 39.

209.     One potential remedy for bullying behaviors is to transfer the student offending to another classroom, or to another campus in the district. *Id*. at 23, 39.

After formal investigation and adjudication of the bullying allegations, all parties are provided appeal rights. *Id*. at 39.[12]

### COUNT I

**Violation of Title IX, Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 *et. seq.***
**and Defendants' Policies and Procedures: Deliberate Indifference to Sexual**
**Harassment; Retaliation Through Stalking and Discrimination;**
**Creation of a Hostile Educational Environment**
**(Against all Defendants, as to Plaintiff R. K.)**

210.     Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

211.     Title IX of the Education Amendments of 1972, 20 U.S. Code § 1681 states, in relevant part, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.[13]

---

[12] The WISD Handbook refers to the "WISD Policy FNG(LOCAL)," but a search performed on May 26, 2024, by counsel for Plaintiffs was unable to locate this policy on the WISD website.
[13] *See* U.S. Department of Education, Office for Civil Rights, Revised Sexual Harassment Guidance Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX (2001) at 19 20, 21 & nn. 98- 101.

212.     The purpose of Title IX is to protect core American values of due process, freedom of speech, equal treatment on the basis of sex, academic freedom, and fundamental fairness.[14]

213.     Title IX applies to educational institutions, including private elementary and secondary schools receiving federal funding. 34 C.F.R. 106.2(i), (k); 20 U.S.C. 3381, Section 1001(f).

214.     WISD Defendants receive federal funding, including in the form of federal student grants given to students, and are thus subject to the provisions of Title IX.[15]

215.     Title IX is enforceable through a private right of action. *See Overdam v. Texas A&M Univ.*, 43 F.4th 522, 527 (5thCir. 2022)(court determined whether the alleged facts raise plausible inference that university discriminated against the plaintiff on basis of sex); *John Doe v. Texas Christian Univ.*, No. 4:22-cv-00297, 2022 WL 17631668, at * 2 (N.D. Tex. Dec. 13, 2022)(Title IX claim need not fit within precise theoretical framework in order to be actionable).

**Title IX Prohibits Sexual Harassment, Stalking,
Discrimination, and Retaliation**

216.     Recipients of federal funds are prohibited from discriminating against any individual for the purpose of interfering with any right or privilege secured by Title IX.

---

[14] U.S. Department of Education Title IX Final Rule Overview, Guiding Principles, p. 1 (June 4, 2024), https://www2.ed.gov/about/offices/list/ocr/docs/titleix-overview.pdf.
[15] *See* National Center for Education Statistics, (April 25, 2024) https://nces.ed.gov/ccd/districtsearch/district_detail.asp?Search=2&ID2=4846200&DistrictID=4846200&details=4 (data showing federal funding given to Winnsboro); Winnsboro ISD, Elementary and Secondary School Emergency Relief (Esser)/RIPICS, (April 25, 2024) https://www.winnsboroisd.org/page/federal-grants (WISD website shows federal grants).

217.    Actions prohibited under Title IX include all forms of sexual harassment. A Title IX cause of action for damages against a school exists based on student-on-student sexual harassment, where the actions involve unwelcome verbal, nonverbal, or physical conduct of a sexual nature, that a reasonable person would believe is so severe, pervasive, and objectively offensive that it effectively deprives the victim of access to the educational opportunities or benefits provided by the school. *See Davis v. Monroe County Board of Education,* 526 U.S. 629, 119 S.Ct. 1661, 1669–76, 143 L.Ed.2d 839 (1999).

218.    Title IX prohibits stalking, defined as: a course of conduct directed at a specific person that would cause a reasonable person to "fear for his or her safety" or "suffer substantial emotional distress." *See* Clery Act, 20 U.S.C. § 1092(f), and the Violence Against Women Act, 34 U.S.C. § 12291(a).

219.    Title IX prohibits a federal funding recipient from subjecting any person to "discrimination" "on the basis of sex." 20 U.S.C. § 1681. Retaliating against an individual because that person has complained of sex discrimination is, in and of itself, a form of intentional sex discrimination encompassed by Title IX's private cause of action. *See* 34 CFR 106.45(a).; *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 173–74, 125 S. Ct. 1497, 1504, 161 L. Ed. 2d 361 (2005).

220.    Title IX defines retaliation and intimidation as follows: "No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege … or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing". Title IX, 34 CFR 106.71, incorporating Title VI, 34 CFR 100.7(e).

221.    Prohibited retaliation under Title IX includes: a strike back in in response to another's action or accusation; Revenge or reaction because of the filing of a complaint against a person; Demotion, firing, unfair treatment, or discrimination due to a filed complaint. *See* Title IX.

222.    Differential treatment on the basis of sex is prohibited under Title IX. No person shall be treated differently in the provision of aid, benefit, or services. 34 CFR 106.31(b)

223.    Retaliation includes differential treatment of a complainant. *Olmstead v. L. C.,* 527 U.S. 581, 614, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999)(KENNEDY, J., concurring in judgment)(the "normal definition of discrimination" is "differential treatment"); *See Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 462 U.S. 669, 682, n. 22, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983)(discrimination means "less favorable" treatment). Retaliation is discrimination on the basis of sex because it is an intentional response to the nature of the complaint: an allegation of sex discrimination. "When a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex' in violation of Title IX." *Jackson,* 544 U.S. at 174.

224.    Title IX also prohibits discrimination that creates a hostile environment, where the discrimination is of a sexual nature and creates an adverse setting; where the victim is intimidated or is in an offensive environment that causes that person to be fearful; where the setting denies, limits, or interferes with the person's ability to participate in a benefit or program, activity or job. *Id*.

225.    Examples of discriminatory actions include: Bullying, abusive or intimidating comments and actions; Intimidating or offensive comments that alter the conditions of a

person's work, classroom, team, or program environment; Continual offensive comments or surroundings of a discriminatory or sexual nature. *Id.*

### WISD Student Handbook, Policies and Procedures Prohibit Bullying, Harassment, Sexual Harassment, Discrimination and Retaliation

226.    As outlined in greater detail above, WISD requires both students and district employees to "treat peers and district employees with courtesy and respect, avoid offensive behaviors, and stop those behaviors as directed. District employees are likewise expected to treat students with courtesy and respect." *Id*. at 48.

227.    WISD allows for general, informal complaints and concerns to be made by parents to a teacher or principal. *See* WISD Board adopted a Student and Parent Complaints/Grievances Policy; *See* Student Handbook.

228.    WISD defines bullying, consistent with Texas state law, to include a single or pattern of acts by one or more students directed at another student, that exploits an imbalance of power, and involves written, verbal or electronic expression, or physical conduct that:

- Has the effect, or will have the effect, of physically harming a student, damaging a student's property, or placing a student in reasonable fear of harm to the student's person or of damage to the student's property;
- Is sufficiently severe, persistent, or pervasive enough that the action or threat creates an intimidating, threatening, or abusive educational environment for a student;
- Materially and substantially disrupts the educational process or the orderly operation of a classroom or school; or
- Infringes on the rights of the victim at school.

Student Handbook at 37-39.

229.    Behaviors such as "hazing, threats, taunting, teasing, confinement, assault … name-calling, rumor-spreading, or ostracism" are cited by WISD as examples of bullying

behavior, including those accomplished by cyberbullying using a camera, cellular phone, email, text messaging, or social media. *Id*. at 38.

230.    Harassment is defined by WISD as: "threatening, intimidating, or humiliating conduct," "offensive jokes, name calling, slurs, or rumors," "physical aggression or assault," or "other kinds of aggressive conduct." *Id.* at 49.

231.    The WISD Handbook defines sexual harassment and gender-based harassment of a student to include: conduct "by an employee … or another student," such as "jokes or conversations of a sexual nature", or "other sexually motivated conduct, communications, or contact" that a reasonable person would construe as sexual in nature. *Id.* at 49-50.

232.    To violate the rules of conduct of WISD, such conduct must be "so severe, persistent, or pervasive that it affects a student's ability to participate in or benefit from an educational program or activity; creates an intimidating, threatening, hostile, or offensive educational environment; or substantially interferes with the student's academic performance." *Id.* at 49.

233.    Discrimination is defined by WISD as: "any conduct directed at a student on the basis of … sex, gender … disability, or any other basis prohibited by law that negatively affects the student." *Id.* at 49.

234.    The WISD Handbook expressly prohibits retaliation against a person who makes a good-faith report or participates in an investigation of discrimination or harassment, including threats, rumor spreading, ostracism, assault, destruction of property, or unjustified punishments. *Id.* at 39, 49-50.

### Title IX's Mandated Grievance Procedures

235.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of a student's complaints alleging any action which would be prohibited by" Title IX or the regulations thereunder. 34 CFR 106.45(b)(1); 34 C.F.R. § 106.8(b) (Department of Education); 28 C.F.R. § 54.135(b) (Department of Justice).

236.    The Department of Education imposes strict legal obligations on schools to promptly respond to reports of sexual harassment, stalking and retaliation.[16] Title IX requires every complainant and respondent to receive appropriate support, due process, fundamental fairness, and impartiality from school officials. 34 CFR 106.44(a).[17]

237.    Schools must offer free supportive measures to every alleged victim of sexual harassment, stalking and retaliation, with or without a formal complaint. Supportive measures are individualized services to restore or preserve equal access to education, protect student and employee safety, or deter sexual harassment. Schools violate Title IX when the response to sexual harassment is clearly unreasonable in light of the known circumstances. 34 CFR 106.45(b)(1)(i).

238.    The Title IX Coordinator is responsible for coordinating the effective implementation of supportive measures. 34 CFR 106.44(a); 34 CFR 106.45(b)(1)(iii).

239.    Schools must also provide a fair and impartial grievance process for complainants and must investigate every formal complaint. Complaints may be filed not only by a

---

[16] U.S. Department of Education Releases Final Title IX Regulations, Providing Vital Protections Against Sex Discrimination (April 19, 2024), https://www.ed.gov/news/press-releases/us-department-education-releases-final-title-ix-regulations-providing-vital-protections-against-sex-discrimination#:~:text=Promote%20accountability%20and%20fairness.&text=The%20final%20rule%20requires%20schools,and%20not%20otherwise%20impermissible%20evidence.

[17] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance ("Final Title IX Rule" or "Title IX"), 34 CFR 106, 85 FR 30026 (August 14, 2020).

complainant, but also by a parent, a teacher, or any third party. Complaints shall be adjudicated by an experienced designated Title IX employee, who must objectively evaluate all relevant evidence without prejudice, bias, or conflict of interest for or against either party. *Id*.

240.    The school and investigator must protect the privacy of all parties by requiring a party's written consent before using the party's medical, psychological, or similar treatment records during a grievance process. Voluntary, written consent must also be obtained before the school can come to an "informal resolution" of the complaints. The investigator must be a different person than the decision-maker in the proceeding, meaning a "single investigator model" is not permitted. For K-12 schools a hearing is not required, but parties may submit written questions for the other parties and witnesses to answer. Both parties shall receive a written determination, explaining how and why the decision-maker reached the conclusions. *Id*.

241.    Schools must effectively implement remedies to protect any individual, including complainants, respondents, and witnesses, from retaliation for reporting sexual harassment or participating (or refusing to participate) in any Title IX grievance process. *Id*.

242.    A school is deemed to have "actual knowledge" of sexual harassment or stalking, or allegations thereof, that occurred "within the school's education program or activity,' over which the school exercised substantial control (including sports and extra-curricular activities), 34 CFR 106.44(a), against any person (not only against one of the school's students), where reported either directly to the Title IX Coordinator, or to "any employee" of the school, by e-mail, phone or mail. 34 CFR 106.30(a). Thus, sexual harassment or

stalking targeting a non-student, such as a teacher or parent, is prohibited behavior that triggers the school's requirements under Title IX.

34 CFR 106.45(b)(1)(iii).

243.    As outlined in greater detail above, the WISD Handbook, and the Procedures and Policies referenced therein, establishes WISD's grievance process pursuant to Title IX for allegations of violations of the standards of conduct. *See* WISD Handbook; Appendix: Freedom from Bullying Policy.

**Defendants' Violations of Title IX Regarding R. K.'s
Complaints of Bullying, Sexual Harassment, Stalking, Discrimination and Retaliation**

244.    There were at least six (6) Incidents of bullying, sexual harassment, stalking, discrimination, and retaliation against R. K. that were reported to Defendants by R. K. and his parents, Plaintiffs S., and D. Kelly, including:

- **Incident 1 -** On or about August 17, 2021, Plaintiff R. K. was subjected to bullying and sexual harassment by another student, Student B, on the WISD campus. Student B used sexually explicit language targeted at Plaintiff R. K.;
- **Incident 2 -** In or about November 2021, Plaintiff R. K. was sexually harassed on the school bus by Student B;
- **Incident 3 -** In or about November 2021, sexually explicit images involving child nudity were airdropped to multiple students, including at least one image of Student B. One of those images was shown to R. K. on another student's phone;
- **Incident 4 -** On or about December 7, 2021, Student B approached R. K., who was in line in athletics, and said (in reference R. K. and the student standing in line in front of him): "you are so gay you look like you are trying to fuck him";
- **Incident 5 -** In or about April 2022, R. K. was bullied again by Student B, after which he was physically assaulted in the boy's locker room for being "a snitch" by Student B's best friend Student D. Thereafter, R. K. was threatened by Student D with additional future physical harm if R. K. "snitched" on Student B again;
- **Incident 6 -** On March 30, 2023, R. K. was again physically assaulted by Student B.

245.    In addition, on April 28, 2022, another student at WISD was allegedly cornered in a bathroom stall by Students B and D, and caused the student to cry, described as Incident 7 above. The occurred the same week as D. Kelly's public comments at the Board Meeting

seeking action to be taken regarding the harassment of his son R. K. by Students B and D, and only six (6) days after R. K. was physically assaulted by Student D.

246.    There were at least ten (10) Complaints made by the Kellys directly to WISD regarding the Incidents, detailed above, and the Defendants failed to investigate, adjudicate, or remedy those behaviors.

247.    Rather than provide R. K. with support services, and investigate the Complaints, the Defendants chose instead to retaliate against R. K., by engaging in an intentional effort to defame him. The Defendants made false statements about his behaviors, and investigated him through his mother, S. Kelly's, employment investigation, where Defendants made false statements in a report that became a permanent educational record of R. K..

248.    Defendants also retaliated against R. K. for his Complaints by releasing his personal identifying information to a third party through the release of the Bully Report, without the consent of R. K. or his parents, and in violation of FERPA.

249.    Defendants failed to comply with Title IX and other federal laws, and its own Student Handbook, Policies and Procedures regarding discrimination, harassment, bullying and retaliation, when it, among other violations, chose not to investigate any of the above Complaints.

250.    Defendants failed to provide R. K. with support services, resulted in the R. K. being physically assaulted twice by male student athletes.

251.    Defendants failed to follow the proper procedure for investigating and adjudicating these behaviors towards R. K. and retaliatory assaults, pursuant to the Title IX requirements, and WISD's own Student Handbook, Policies and Procedures, which

emboldened Student B and WISD staff to continue to act in this discriminatory and harassing fashion.

252.    Defendants' actions and failures to investigate the Complaints created and perpetuated a toxic, hostile educational environment for R. K..

253.    Defendants failed to promptly and adequately address the Plaintiffs' Complaints of bullying, sexual harassment, gender-based harassment, discrimination, and stalking behaviors towards their son Plaintiff R. K., failed to conduct a timely and thorough investigation, failed to take real steps to stop those behaviors towards R. K., and did so with deliberate indifferent, possessing actual and constructive knowledge of those Complaints and behaviors.

254.    The failure of a school to promptly and adequately address complaints of sexual harassment amounts to "deliberate indifference" for which WISD may be held liable under Title IX.

255.    As a result of WISD's deliberate indifference to Plaintiffs' Complaints, and failure to adequately investigate and remedy the misconduct of the Student B, Plaintiff R. K. continued to be subjected to sexual harassment, gender-based harassment, bullying and stalking, until he eventually withdrew from WISD and transferred to another district due to fear for his safety, well-being, and extreme emotional distress.

256.    As a direct and proximate result of the Defendants' actions, and failures to act, R. K. suffered unfair and unreasonable limitations on his educational experience. For years R. K. was in constant fear at school of being harassed, intimidated, humiliated, and physically assaulted. R. K. was unable to fully enjoy and participate in his athletic events due to his father being banned from his games. R. K.'s regular, ongoing harassment, intimidation,

retaliation, and physical assaults that were reported to Defendants, and Defendants' refusal to protect R. K. from those behaviors, caused him serious emotional distress, and resulted directly in him quitting the WISD basketball program. R. K. did not feel safe participating in the basketball program, or even simply attending school.

## COUNT II

### Violation of Title IX, Education Amendments of 1972,
### 20 U.S.C. §§ 1681-1688 and Defendants' Policies and Procedures:
### Retaliation and Creation of a Hostile Educational Environment
### (Against all Defendants, as to Plaintiff S. Kelly)

257.   Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

258.   Students B and D engaged in prohibited conduct under Title IX, and WISD's own Policies and Procedures.

259.   Defendants subjected S. Kelly to years of adverse acts because of her Complaints of sexual harassment, discrimination, stalking, and retaliation targeting her son R. K., and her concerns about the Defendants' mishandling of those Complaints, in clear retaliation therefore, which is prohibited under Title IX, and WISD's own policies.

260.   The Defendants failed and outright refused to promptly and adequately address the Plaintiffs' legitimate Complaints of bullying, sexual harassment, gender-based harassment, discrimination, and stalking behaviors towards their son.

261.   The Defendants failed to conduct a timely and thorough investigation of the Complaints.

262.   The Defendants were given actual and constructive notice of those unlawful behaviors towards R. K., yet the failed and refused to take the legally required action that was warranted.

263.    The failure of a school to promptly and adequately address the Complaints amounts to "deliberate indifference" for which the Defendants may be held liable under Title IX.

264.    In response to Plaintiffs' Complaints, Plaintiff S. Kelly was retaliated against repeatedly, through false statements made by the Defendants to other employees at WISD, to the School Board, and to the TEA. Defendants also retaliated against S. Kelly through a false investigation into her employment, and false reports made about her son in the report the resulted from her employment investigation.

265.    In response to Plaintiffs' Complaints, Plaintiff S. Kelly was also subjected to the suspension of her employment with WISD, being banned from campus and her son and daughter's school meetings and activities and having her employment contract not renewed.

266.    On November 10, 2022, after S. Kelly's campus ban had already been lifted, Principal Kim Nash made an appointment for S. Kelly to come on campus to discuss the Complaints. As S. Kelly waited in the lobby, S. Kelly was threatened with arrest if she did not leave without any warning.

267.    Title IX prohibits Defendants from harassing, discriminating against, stalking, and retaliating against S. Kelly in response to her filing of Complaints. Recipients of federal funds are prohibited from intimidating, threatening, coercing, or discriminating against any individual for the purpose of interfering with any right or privilege secured by Title IX.

268.    Title IX prohibits stalking, defined as: a course of conduct directed at a specific person that would cause a reasonable person to "fear for his or her safety" or "suffer substantial emotional distress." *See* Clery Act, 20 U.S.C. § 1092(f), and the Violence Against Women Act, 34 U.S.C. § 12291(a).

58

269.    Title IX prohibits a federal funding recipient from subjecting any person to "discrimination" "on the basis of sex." 20 U.S.C. § 1681. Retaliation against an individual because that person has complained of sex discrimination is, in and of itself, a form of intentional sex discrimination encompassed by Title IX's private cause of action. *See* 34 CFR 106.45(a).; *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 173–74, 125 S. Ct. 1497, 1504, 161 L. Ed. 2d 361 (2005).

270.    Title IX defines retaliation and intimidation as follows: "No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege … or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing". Title IX, 34 CFR 106.71, incorporating Title VI, 34 CFR 100.7(e).

271.    Prohibited retaliation under Title IX includes: a strike back in in response to another's action or accusation; Revenge or reaction because of the filing of a complaint against a person; Demotion, firing, unfair treatment, or discrimination due to a filed complaint. *See* Title IX.

272.    Title IX prohibits discrimination that creates a hostile environment, where the victim, here S. Kelly, is intimidated or is in an offensive environment that causes that person to be fearful, or where the setting denies, limits, or interferes with S. Kelly's ability to participate in a benefit or program, activity, or job. *Id*. Due to Defendants' retaliation against her, S. Kelly was clearly intimidated, subjected to a hostile environment at WISD, both as an employee and as a mother to her son and daughter, and her ability to maintain her employment and motherly participation in the school meetings and activities of both her children was denied, limited, and interfered with by the Defendants.

273.    Title IX considers it a discriminatory action for Defendants to bully, abuse or intimidate S Kelly, or to make offensive comments that alter the conditions of her work, classroom, team, or program environment. *Id*. Defendants' retaliatory actions against S. Kelly did bully, abuse, and intimidate her, and their offensive false statements about her and her son altered the conditions of her work and program environment, by blocking her from her employment and from full participation in the school program of her son and daughter.

274.    "When a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex' in violation of Title IX." *Jackson,* 544 U.S. at 174. Therefore, Defendants' acts of retaliation against S. Kelly constitute discrimination on the basis of sex in violation of Title IX, because those acts were an intentional response to the nature of the complaint: an allegation of sex discrimination.

275.    As outlined in greater detail above, WISD's Student Handbook requires both students and district employees to "treat peers and *district employees* with courtesy and respect, avoid offensive behaviors, and stop those behaviors as directed" *Id*. at 48 (emphasis added).

276.    WISD's Student Handbook, Policies and Procedures allow for general, informal complaints and concerns to be made by parents to a teacher or principal, as S. Kelly did initially with her email Bully Report. *See* WISD Board adopted a Student and Parent Complaints/Grievances Policy; *See* WISD Handbook.

277.    WISD's Handbook defines harassment to include "threatening, intimidating, or humiliating conduct," such as the behaviors Defendants engaged in towards S. Kelly and her position as an employee at WISD. *Id.* at 49.

278.    The WISD Handbook expressly prohibits retaliation against a person who makes a good-faith report or participates in an investigation of discrimination or harassment, including threats, rumor spreading, ostracism, assault, destruction of property, or unjustified punishments. *Id*. at 39, 49-50. Defendants violated these WISD rules by engaging in the actions described above against S. Kelly and her employment with WISD.

279.    As a direct and proximate result of S. Kelly's Complaints about the treatment of her son and Defendants' failure to investigate or adjudicate that treatment, Defendants engaged in the above retaliatory actions, causing her to lose her employment, her source of income, her enjoyment of that position, impacting her future career potential, and blocking her from participating in the school program fully with her son and daughter.

280.    The years of adverse acts which S. Kelly faced because of her Complaints constitute clear harassment, intimidation, stalking, discrimination, and retaliation against her, which is prohibited under Title IX, and WISD's own policies. See, e.g., Jackson v. Birmingham Board of Education, 544 U.S. 167 (2005); Peters v. Jenney, 327 F.3d 307, 320-21 (4th Cir. 2003); Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002); Winnsboro ISD, 250907, Student Welfare Freedom from Discrimination, Harassment and Retaliation, issued June 21, 2022.

281.    Title IX prohibits Defendants from attempting to derail S. Kelly's career as a result of the filing of the Title IX Complaints, which constitutes unlawful retaliation.

282.     S. Kelly has been unable to find employment in her profession after she was suspended, banned from WISD campus, and her contract of employment was not renewed.

283.     To date, S. Kelly and her family continue to fear further unlawful acts against them by Defendants, including further retaliation.

284.     As a direct and proximate result of WISD's deliberate indifference to the Title IX Complaints, S. Kelly became fearful of retaliation both by Defendants and even in the community, and as a result suffers significant, severe, and ongoing emotional distress and mental anguish.

285.     As a result of the foregoing, Plaintiff S. Kelly is entitled to damages in an amount to be determined at trial, including without limitation, damages to her reputation for false statements made, past and future economic losses, emotional and psychological damages, plus pre-judgment interest, attorneys' fees, expenses, costs, and disbursements.

286.     As a result of the foregoing, Plaintiff S. Kelly is also entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201, that the WISD Defendants intentionally discriminated against her on the basis of sex due to their retaliation against her for filing and pursuing the Complaints, denying her, as a parent, equal access to Defendant WISD's resources and opportunities, thereby altering the educational environment for her son, Plaintiff R. K. and his daughter Student C.

## COUNT III

### Violation of Title IX, Education Amendments of 1972, 20 U.S.C. §§ 1681-1688:
**Retaliation and Creation of a Hostile Educational Environment
(Against all Defendants, as to Plaintiff D. Kelly)**

287.     Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

288.    Defendants subjected D. Kelly to years of adverse acts because of his Complaints of sexual harassment, discrimination, stalking, and retaliation targeting his son R. K., and his concerns about the Defendants' mishandling of those Complaints, in clear retaliation therefore, which is prohibited under Title IX, and WISD's own policies.

289.    The Defendants failed and outright refused to promptly and adequately address the Plaintiffs' legitimate Complaints of bullying, sexual harassment, gender-based harassment, discrimination, and stalking behaviors towards their son.

290.    The Defendants failed to conduct a timely and thorough investigation of the Complaints.

291.    The Defendants were given actual and constructive notice of those unlawful behaviors towards R. K., yet the failed and refused to take the legally required action that was warranted.

292.    The failure of a school to promptly and adequately address the Complaints amounts to "deliberate indifference" for which the Defendants may be held liable under Title IX.

293.    In response to the Plaintiffs' Complaints, Plaintiff D. Kelly was retaliated against repeatedly, by falsely reporting him to his employer on two separate occasions. The complaints made by Defendants against D. Kelly to his employer were deemed unsubstantiated.

294.    In response to Plaintiffs' Complaints, the Defendants served D. Kelly with a criminal trespass banning him from WISD campus, and from participating fully in the meetings and school activities of his son and daughter.

295.    As a result of the Defendants' retaliatory acts against him, D. Kelly continues to be afraid of further retaliation by Defendants, including the fear of being reprimanded or fired from his job.

296.    Title IX prohibits Defendants from harassing, discriminating against, stalking, and retaliating against D. Kelly in response to him filing Complaints. Recipients of federal funds are prohibited from intimidating, threatening, coercing, or discriminating against any individual for the purpose of interfering with any right or privilege secured by Title IX.

297.    Title IX prohibits stalking, defined as: a course of conduct directed at a specific person that would cause a reasonable person to "fear for his or her safety" or "suffer substantial emotional distress." *See* Clery Act, 20 U.S.C. § 1092(f), and the Violence Against Women Act, 34 U.S.C. § 12291(a).

298.    Title IX prohibits a federal funding recipient from subjecting any person to "discrimination" "on the basis of sex." 20 U.S.C. § 1681. Retaliation against an individual because that person has complained of sex discrimination is, in and of itself, a form of intentional sex discrimination encompassed by Title IX's private cause of action. *See* 34 CFR 106.45(a).; *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 173–74, 125 S. Ct. 1497, 1504, 161 L. Ed. 2d 361 (2005).

299.    Title IX defines retaliation and intimidation as follows: "No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege … or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing". Title IX, 34 CFR 106.71, incorporating Title VI, 34 CFR 100.7(e).

300.    Prohibited retaliation under Title IX includes: a strike back in in response to another's action or accusation; revenge or reaction because of the filing of a complaint against a person; Demotion, firing, unfair treatment, or discrimination due to a filed complaint. *See* Title IX.

301.    Title IX prohibits discrimination that creates a hostile environment, where the victim, here D. Kelly, is intimidated or is in a hostile environment that causes that person to be fearful, or where the setting denies, limits, or interferes with the ability to participate in a benefit or program, activity, or job. *Id*. Due to Defendants' retaliation against him, D. Kelly was clearly intimidated, in an offensive environment at WISD as a father to his children, and his ability to maintain his employment was limited, and interfered with by the Defendants.

302.    Title IX considers it a discriminatory action for Defendants to bully, abuse or intimidate D. Kelly, or to make offensive comments that alter the conditions of the WISD program environment. *Id*. Defendants' retaliatory actions against D. Kelly did bully, abuse, and intimidate him, and their offensive false statements about him and his son altered the conditions of the WISD program environment, by blocking him from full participation in the school program of his son and daughter.

303.    "When a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex' in violation of Title IX." *Jackson,* 544 U.S. at 174. Therefore, Defendants' acts of retaliation against D. Kelly constitute discrimination on the basis of sex in violation of Title IX, because those acts were an intentional response to the nature of the complaint: an allegation of sex discrimination.

304.    WISD's Student Handbook, Policies and Procedures allow for general, informal complaints and concerns to be made by parents to a teacher or principal, as D. Kelly did. *See* WISD Board adopted a Student and Parent Complaints/Grievances Policy; *See* WISD Handbook.

305.    WISD's Handbook defines harassment to include "threatening, intimidating, or humiliating conduct," such as the behaviors Defendants engaged in towards D. Kelly. *Id.* at 49.

306.    The WISD Handbook expressly prohibits retaliation against a person who makes a good-faith report or participates in an investigation of discrimination or harassment, including threats, rumor spreading, ostracism, assault, destruction of property, or unjustified punishments. *Id*. at 39, 49-50. Defendants violated these WISD rules by engaging in the actions described above against D. Kelly.

307.    As a direct and proximate result of D. Kelly's Complaints about the treatment of his son and Defendants' failure to investigate or adjudicate that treatment, Defendants banned him from campus, filed a false trespass warning against him, causing him problems with his employment, and put him in fear of further harassment and retaliation.

308.    The years of adverse acts which D. Kelly faced because of his Complaints constitute clear harassment, intimidation, stalking, discrimination, and retaliation against him, which is prohibited under Title IX, and WISD's own policies. See, e.g., Jackson v. Birmingham Board of Education, 544 U.S. 167 (2005); Peters v. Jenney, 327 F.3d 307, 320-21 (4th Cir. 2003); Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002); Winnsboro ISD, 250907, Student Welfare Freedom from Discrimination, Harassment and Retaliation, issued June 21, 2022.

309.    Title IX prohibits Defendants from attempting to derail D. Kelly's career by filing false complaints with his employer as a result of the filing of the Title IX Complaints, or his criticisms against Defendants for failing to address those Complaints, which constitutes unlawful retaliation.

310.    The Defendants' behavior towards D. Kelly and his family has created a divide in the small community where they live and caused all of the Plaintiffs to become targets of some hostile community members.

311.    Defendants' violations of Title IX and their Policies and Procedures causing D. Kelly direct and proximate financial and career harm, emotional distress, and fear for his safety and well-being, and the safety and well-being of his entire family.

312.    As a direct and proximate result of WISD's deliberate indifference to Plaintiff's Complaints, in violation of Title IX, not only was D. Kelly's son subjected to a hostile educational environment while attempting to pursue his education at WISD, but D. Kelly himself was also subjected to a hostile environment at the school, by receiving an unwarranted trespass warning, having multiple false complaint made to his employer, and depriving him from participating in school meetings, programs and activities of both his son and daughter.

313.    As a direct and proximate result of WISD's deliberate indifference, D. Kelly became fearful of retaliation by Defendants, both at the school, with his employer, and in the community, and as a result suffers significant, severe, and ongoing emotional distress and mental anguish.

314.    As a result of the foregoing, Plaintiff D. Kelly is entitled to damages in an amount to be determined at trial, including without limitation, damages to his reputation for false

statements made, past and future economic losses, emotional and psychological damages, plus pre-judgment interest, attorneys' fees, expenses, costs, and disbursements.

315.     As a result of the foregoing, Plaintiff D. Kelly is also entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201, that the WISD Defendants intentionally discriminated against him on the basis of sex due to their retaliation against him for filing and pursuing the Complaints, denying D. Kelly, as a parent, of equal access to Defendant WISD's resources and opportunities, thereby altering the educational environment for him, his son, his wife, and his daughter.

## COUNT IV

### Violation of Title II of the Americans with Disabilities Act of 1990, U.S.C. §§ 12131 *et seq.*, and its implementing regulation at 28 C.F.R. Part 35: Deliberate Indifference to Disability-Based Harassment; Retaliation Through Stalking and Discrimination; Creation of a Hostile Educational Environment (Against All Defendants, as to All Plaintiffs)

316.     Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

317.     Title II of the Americans with Disabilities Act states:

a.   "(a) No private or public entity shall discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act or this part. (b) No private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part."

b.   28 CFR 35.134; Title II of the Americans with Disabilities Act of 1990, U.S.C. §§ 12131 et seq., and its implementing regulation at 28 C.F.R. Part 35 ("ADA Title II").

318.    The Defendants discriminated against Plaintiff R. K. through deliberate indifference to the disability-based harassment that he suffered at the hands of Students B and D.

319.    ADA Title II prohibits discrimination on the basis of disability by public elementary educational institutions, including prohibiting the school's deliberate indifference to harassment based on personal characteristics such as disability. *Est. of Lance v. Lewisville Indep. Sch. Dist.,* 743 F.3d 982, 995 (5th Cir. 2014). Other federal circuits have also applied the deliberate indifference standard under Section 504.[18]

320.    In the context of a Section 504 claim, Plaintiff R. K. must show:

> (1) he was an individual with a disability;
> (2) he was harassed based on his disability;
> (3) the harassment was sufficiently severe or pervasive that it
> altered the condition of his education and created an abusive educational
> environment,
> (4) the Defendants knew about the harassment; and
> (5) the Defendants were deliberately indifferent to the harassment.

S.S. v. E. Ky. Univ., 532 F.3d 445, 454 (6th Cir.2008); see also Davis, 526 U.S. at 650, 119 S.Ct. 1661.

321.    Title II also prohibits retaliation against any individual who asserts rights or privileges under these laws or who files a complaint, testifies, assists, or participates in a proceeding under these laws.

---

[18] Other circuits have interpreted the U.S. Supreme Court's application of the deliberate indifference standard under Title IX in the *Davis* case to apply to cases under Section 504 involving harassment based on personal characteristics, such as a disability. *See Davis v. Monroe County Board of Education*, 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). *See also S.H. ex rel. Durrell v. Lower Merion Sch. Dist.,* 729 F.3d 248, 264 (3d Cir.2013)(assessing the standard for intentional discrimination in a claim against a school district for misdiagnosing a student's disability but noting that "a showing of deliberate indifference may satisfy a claim for compensatory damages under § 504"); *M.L. v. Fed. Way Sch. Dist.,* 394 F.3d 634, 650–51 (9th Cir.2004)("If a teacher is deliberately indifferent to teasing of a disabled child and the abuse is so severe that the child can derive no benefit from the services that he or she is offered by the school district, the child has been denied a [free and appropriate public education.").

322.     Plaintiff R. K. was an individual with a disability due to his ADHD and was registered under Section 504 with WISD in August of 2021. He was assessed also in the Spring semester of 2021, and determined to have an anxiety disorder, generalized anxiety disorder, and separation anxiety disorder. He was given Section 504 status for his ADHD and WISD noted that he was struggling due to his anxiety. WISD held numerous Section 504 meetings with R. K.'s parents.

323.     Plaintiff R. K. was harassed by Student B and D on numerous occasions, including verbal, electronic, and physical assaults, based on his disability, because his disability caused R. K. to appear to his classmates to be shy and a good target. The unlawful behaviors towards R. K. included severe sexual language, threats of physical harm, intimidation, physical harm on two occasions, and threats of further physical harm in the future, among others.

324.     The harassment of Plaintiff R. K. by Students B and D was so severe and pervasive that his educational environment was altered, and it created an abusive environment.

325.     Plaintiff R. K. reported the harassment through his parents S. and D. Kelly on numerous occasions, including in writing, in-person meetings with WISD administrators, and publicly at WISD Board Meetings.

326.     The Defendants were deliberately indifferent to the harassment against R. K. by Students B and D, in violation of ADA Title II. Defendants failed and refused to investigate R. K.'s Complaints of harassment that were reported through his parents.

327.     In addition, rather than investigate and adjudicate those Complaints to provide R. K. with a supportive and fulfilling educational environment, Defendants chose instead to engage in a year's long retaliatory campaign against all of the Plaintiffs.

328.    R. K. was subjected to extreme retaliatory acts by the Defendants, including their false statements about his behavior in an employment report for his mother S. Kelly, statements made before the School Board, and other false statements made by WISD staff on numerous occasions.

329.    R. K. was also subjected to extreme retaliatory acts by the Defendants when they released his privileged information contained in the Bully Report to the public, in violation of FERPA.

330.    S. Kelly was also subjected to extreme retaliatory acts by the Defendants. She was suspended from her employment with WISD, banned from campus, and had her employment contract not renewed by the School Board. WISD staff made numerous false statements about her to the TEA, to the School Board and others, on numerous occasions.

331.    The failure and refusal by the Defendants to provide R. K. with the support he needed during these difficult years of harassment by Students B and D, and the failure and refusal to investigate and adjudicate those Complaints, caused R. K. to be in fear of his safety and well-being, and suffer severe emotional distress and anguish.

332.    The Defendants ongoing retaliatory acts against all the Plaintiffs also caused them to be in fear for their safety and well-being, resulting in severe emotional distress and anguish.

333.    The impact of Defendants' deliberate indifference to R. K.'s Complaints was so significant that R. K. eventually transferred out of WISD to another district.

334.    Plaintiffs all continue to fear further unlawful acts against them by members of the community, and the Defendants.

335.    As a result of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial, including without limitation, damages to their reputations for false statements made, past and future economic losses, emotional and psychological damages, plus pre-judgment interest, attorneys' fees, expenses, costs, and disbursements.

336.    As a result of the foregoing, Plaintiffs are also entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201, that the WISD Defendants discriminated against all Plaintiffs on the basis of disability because of their deliberate indifference to the Complaints, because of their denial to all Plaintiffs of equal access to WISD's resources and opportunities, and thereby altering the WISD educational environment for the Plaintiffs.

## COUNT V

### Violation of Section 504 of the Rehabilitation Act of 1973 (Section 504), as amended, 29 U.S.C. § 794, and its implementing regulation at 34 C.F.R. Part 104: Deliberate Indifference to Disability-Based Harassment; Retaliation Through Stalking and Discrimination; Creation of a Hostile Educational Environment (Against All Defendants, as to All Plaintiffs)

337.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

338.    Section 504 of the Rehabilitation Act of 1973 (Section 504), as amended, 29 U.S.C. § 794, and its implementing regulation at 34 C.F.R. Part 104, prohibits discrimination on the basis of disability.

339.    Section 504 also prohibits retaliation against any individual who asserts rights or privileges under these laws or who files a complaint, testifies, assists, or participates in a proceeding under these laws.

340.    The Defendants discriminated against all Plaintiffs through deliberate indifference to the disability-based harassment that Plaintiff R. K. suffered at the hands of Students B and D.

341.    Section 504 prohibits discrimination on the basis of disability by public elementary educational institutions, including prohibiting the school's deliberate indifference to harassment based on personal characteristics such as disability.

342.    Section 504 also prohibits retaliation against any individual who asserts rights or privileges under these laws or who files a complaint, testifies, assists, or participates in a proceeding under these laws.

343.    Plaintiff R. K. was an individual with a disability. He was assessed in the Spring semester of 2021, and determined to have an anxiety disorder, generalized anxiety disorder, and separation anxiety disorder. He was given Section 504 status by the Defendants, and WISD held Section 504 meetings with his parents.

344.    Plaintiff R. K. was harassed by Student B and D on numerous occasions, including verbal, electronic, and physical assaults, based on his disability, because his disability caused R. K. to appear to his classmates to be shy and a good target. The unlawful behaviors towards R. K. included severe sexual language, threats of physical harm, intimidation, physical harm on two occasions, and threats of further physical harm in the future, among others.

345.    The harassment of Plaintiff R. K. by Students B and D was so severe and pervasive that his educational environment was altered, and it created an abusive environment.

346.    Plaintiff R. K. reported the harassment through his parents S. and D. Kelly on numerous occasions, including in writing, in-person meetings with WISD administrators, and publicly at WISD Board Meetings.

347.    The Defendants were deliberately indifferent to the harassment against R. K. by Students B and D, in violation of ADA Title II. Defendants failed and refused to investigate R. K.'s Complaints of harassment that were reported through his parents.

348.    In addition, rather than investigate and adjudicate those Complaints to provide R. K. with a supportive and fulfilling educational environment, Defendants chose instead to engage in a years' long retaliatory campaign against all of the Plaintiffs.

349.    R. K. was subjected to extreme retaliatory acts by the Defendants, including their false statements about his behavior in an employment report for his mother S. Kelly, statements made before the School Board, and other false statements made by WISD staff on numerous occasions.

350.    R. K. was also subjected to extreme retaliatory acts by the Defendants when they released his privileged information contained in the Bully Report to the public, in violation of FERPA.

351.    S. Kelly was also subjected to extreme retaliatory acts by the Defendants. She was suspended from her employment with WISD, banned from campus, and had her employment contract not renewed by the School Board. WISD staff made numerous false statements about her to the TEA, to the School Board and others, on numerous occasions.

352.    The failure and refusal by the Defendants to provide R. K. with the support he needed during these difficult years of harassment by Students B and D, and the failure and refusal to investigate and adjudicate those Complaints, caused R. K. to be in fear of his safety and well-being, and suffer severe emotional distress and anguish.

353.    The Defendants ongoing retaliatory acts against all the Plaintiffs also caused them to be in fear for their safety and well-being, resulting in severe emotional distress and anguish.

354.    The impact of Defendants' deliberate indifference to R. K.'s Complaints was so significant that R. K. eventually transferred out of WISD to another district.

355.    Plaintiffs all continue to fear further unlawful acts against them by members of the community, and the Defendants.

356.    As a result of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial, including without limitation, damages to their reputations for false statements made, past and future economic losses, emotional and psychological damages, plus pre-judgment interest, attorneys' fees, expenses, costs, and disbursements.

357.    As a result of the foregoing, Plaintiffs are also entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201, that the WISD Defendants discriminated against all Plaintiffs on the basis of disability because of their deliberate indifference to the Complaints, because of their denial to all Plaintiffs of equal access to WISD's resources and opportunities, and thereby altering the WISD educational environment for the Plaintiffs.

## **PRAYER FOR RELIEF**

358.    **WHEREFORE**, for the foregoing reasons, Plaintiffs demand judgment against Defendants as follows:

### **Count I**

Violation of Title IX, Education Amendments of 1972, 20 U.S.C. §§ 1681-1688: Deliberate Indifference to Sexual Harassment; Creation of a Hostile Educational Environment; Stalking; and Retaliation (Against all Defendants, as to Plaintiff R. K.), Plaintiff R. K. asks the Court for a judgment awarding him:

(i)     damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, damages to reputation, emotional and psychological damages,

damages to reputation, past and future economic losses, loss of educational and career opportunities, plus pre-judgment interest, attorneys' fees, expenses, costs, and disbursements;

(ii)    a declaratory judgment pursuant to 28 U.S.C. § 2201, that Defendants intentionally discriminated against Plaintiff R. K. on the basis of sex through deliberate indifference to his Complaints, by retaliating against him, and by condoning and creating a hostile educational environment due to knowingly permitting Students B and D to engage in prolonged harassment of Plaintiff R. K. based on sex, and permitting that harassment in the school's programs and activities with actual knowledge of, deliberate indifference to and an apparent approval of said sex based harassment, with the consequence that Plaintiff R. K. was denied equal access to Defendant WISD's resources and opportunities, thereby altering Plaintiff R. K.'s educational experience; and

(iii)    such other and further relief as the Court deems just and proper.

## Count II

Violation of Title IX, Education Amendments of 1972, 20 U.S.C. §§ 1681-1688: Retaliation, Stalking, and Creation of a Hostile Educational Environment (Against all Defendants, as to Plaintiff S. Kelly), Plaintiff S. Kelly asks the Court for a judgment awarding her:

(i)    damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, damages to reputation, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, plus pre-judgment interest, attorneys' fees, expenses, costs, and disbursements;

(ii)    a declaratory judgment pursuant to 28 U.S.C. § 2201, that Defendants intentionally retaliated against Plaintiff S. Kelly, and condoned and created a hostile educational environment due to knowingly permitting Students B and D to engage in prolonged harassment of Plaintiff R. K. based on sex, and permitting that harassment in the school's programs and activities with actual knowledge of, deliberate indifference to and an apparent approval of said sex based harassment, with the consequence that Plaintiff S. Kelly was denied equal access to Defendant WISD's resources and opportunities, thereby altering Plaintiff S. Kelly's experience with WISD and her children; and

(iii)    such other and further relief as the Court deems just and proper.

## Count III

Violation of Title IX, Education Amendments of 1972, 20 U.S.C. §§ 1681-1688: Retaliation, Stalking, and Creation of a Hostile Educational Environment (Against all Defendants, as to Plaintiff D. Kelly), Plaintiff D. Kelly asks the Court for a judgment awarding him:

(i)  damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, damages to reputation, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, plus pre-judgment interest, attorneys' fees, expenses, costs, and disbursements;

(ii)  a declaratory judgment pursuant to 28 U.S.C. § 2201, that Defendants intentionally retaliated against Plaintiff D. Kelly, and by condoning and creating a hostile educational environment due to knowingly permitting Students B and D to engage in prolonged harassment of Plaintiff R. K. based on sex, and permitting that harassment in the school's programs and activities with actual knowledge of, deliberate indifference to and an apparent approval of said sex based harassment, with the consequence that Plaintiff D. Kelly was denied equal access to Defendant WISD's resources and opportunities, thereby altering Plaintiff D. Kelly's experience with WISD and his children; and

(iii)  such other and further relief as the Court deems just and proper.

## Count IV

Violation of Title II of the Americans with Disabilities Act of 1990, U.S.C. §§ 12131 *et seq.*, and its implementing regulation at 28 C.F.R. Part 35: Deliberate Indifference to Disability-Based Harassment; Retaliation Through Stalking and Discrimination; Creation of a Hostile Educational Environment (Against All Defendants, as to All Plaintiffs), all Plaintiffs ask the Court for a judgment awarding them each:

(i)  damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, damages to reputation, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, plus pre-judgment interest, attorneys' fees, expenses, costs, and disbursements;

(ii)  a declaratory judgment pursuant to 28 U.S.C. § 2201, that Defendants intentionally discriminated against all Plaintiff on the basis of disability through deliberate indifference to the Complaints, by retaliating against all Plaintiffs with stalking and discriminatory acts, and by condoning and creating a hostile educational environment due to knowingly permitting Students B and D to engage in prolonged harassment of Plaintiff R. K. based on disability, and permitting that harassment in the school's programs and activities with actual knowledge of, deliberate indifference to and an apparent approval of said disability based harassment, with the consequence that all Plaintiffs were denied equal access to Defendant WISD's resources and opportunities, thereby altering Plaintiff R. K.'s educational experience and interfering with Plaintiffs S. and D. Kelly's rights as parents of WISD students; and

(iii)  such other and further relief as the Court deems just and proper.

**Count V**

Violation of Section 504 of the Rehabilitation Act of 1973 (Section 504), as amended, 29 U.S.C. § 794, and its implementing regulation at 34 C.F.R. Part 104 Deliberate Indifference to Disability-Based Harassment; Retaliation Through Stalking and Discrimination; Creation of a Hostile Educational Environment (Against All Defendants, as to All Plaintiffs), all Plaintiffs ask the Court for a judgment awarding them each:

(i)       damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, damages to reputation, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, plus pre-judgment interest, attorneys' fees, expenses, costs, and disbursements;

(ii)      a declaratory judgment pursuant to 28 U.S.C. § 2201, that Defendants intentionally discriminated against all Plaintiff on the basis of disability through deliberate indifference to the Complaints, by retaliating against all Plaintiffs with stalking and discriminatory acts, and by condoning and creating a hostile educational environment due to knowingly permitting Students B and D to engage in prolonged harassment of Plaintiff R. K. based on disability, and permitting that harassment in the school's programs and activities with actual knowledge of, deliberate indifference to and an apparent approval of said disability based harassment, with the consequence that all Plaintiffs were denied equal access to Defendant WISD's resources and opportunities, thereby altering Plaintiff R. K.'s educational experience and interfering with Plaintiffs S. and D. Kelly's rights as parents of WISD students; and

(iii)     such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

July 17, 2024

Respectfully submitted,

_____

Andrew T. Miltenberg
(*pro hac vice* admission pending)
Christine D. Brown
(*pro hac vice* admission pending)
Tara Davis
(*pro hac vice* admission pending)
Kimberly Courtney
(*pro hac vice* admission pending)
NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, 5th Floor
New York, New York 10001
212-736-4500 (telephone)
amiltenberg@nmllplaw.com
cbrown@nmlllplaw.com
tdavis@nmllplaw.com
kcourtney@nmllplaw.com

*/s/ Jeffrey T. Embry*
Jeffrey T. Embry
State Bar No. 24002052
jeff@hossleyembry.com
**HOSSLEY EMBRY, LLP**
515 S. Vine Ave.
Tyler, Texas 75702
Ph.  903-526-1772
**ATTORNEYS FOR PLAINTIFFS**